C. ANTHONY MARTIGNETTI & others,[1] trustees,[2] *vs.*
HAIGH-FARR, INC., & another.[3]

Middlesex. April 8, 1997. - June 24, 1997.

Present: WILKINS, C.J., ABRAMS, LYNCH, GREANEY, & FRIED, JJ.

*Hazardous Materials. Massachusetts Oil and Hazardous Material Release
Prevention Act. Comprehensive Environmental Response Compensation
and Liability Act. Corporation,* Subsidiary. *Contribution. Joint and Several
Obligation. Practice, Civil,* Attorney's fees, Costs. *Words,* "Operator."

This court concluded that, in a claim brought under G. L. c. 21E, § 4, as in
    effect in 1989, for reimbursement of costs of removal of hazardous mate-
    rial, a person who fell within one of the categories of liability listed in
    G. L. c. 21E, § 5, may be subject to the § 4 claim without a separate find-
    ing of liability under § 5. [297-299]
Discussion of the standards by which to measure the liability of a parent
    corporation as an operator of a site, owned or operated by a subsidiary, at
    which there has been a release of hazardous material. [299-301]
In a claim brought under G. L. c. 21E, § 4, in which the judge's instructions
    incorrectly stated the requirements for establishing liability as an "opera-
    tor" of a site at which there had been a release of hazardous material, the
    verdict in the plaintiffs' favor was vacated; where, however, the plaintiffs
    presented sufficient evidence to obtain jury consideration of their claim
    under the appropriate test, they were entitled to a new trial. [301-305]
This court, considering legislative intent and Federal decisions interpreting
    cognate Federal law (the Federal Comprehensive Environmental Response
    Compensation and Liability Act of 1980 [CERCLA] and the Superfund
    Amendments and Reauthorization Act of 1986 [SARA]), construed the
    provisions of G. L. c. 21E, § 4, as in effect in 1989, to allocate the costs of
    hazardous material cleanup as in an action for contribution, that is, among
    the parties whose underlying responsibility to the Commonwealth is
    imposed by the provisions of G. L. c. 21E, § 5. [305-312]
In an action brought in 1989 pursuant to the then effective provisions of G. L.
    c. 21E, § 4, by a person liable for hazardous material cleanup costs and
    for contribution from others toward those costs, the judge appropriately
    asked the jury to assign an equitable share of the damages

---

[1]Daniel A. Martignetti, Joseph A. Martignetti, and Ronald A. Martignetti.
[2]Of Martignetti Brothers Realty Trust.
[3]Charles E. Farr.

among the parties taking into account the relative degrees of contribution to the contamination and any other factors appropriate to balance the equities in the totality of the circumstances. [312-314]

This court concluded that, although persons who are subject to strict liability under G. L. c. 21E, § 5, for a hazardous waste release are jointly and severally liable, an action under G. L. c. 21E, § 4, to require contribution among them can impose several liability only [315], and, in circumstances in which a responsible party is insolvent, the amount attributable to such a party (an "orphan share") is to be allocated among the available solvent parties on an equitable basis [315-318].

This court concluded that, at the retrial of an action pursuant to G. L. c. 21E, § 4, if the plaintiffs are found to be liable for any equitable share of the response costs, they will thus not be entitled to an award of attorney's fees and costs under G. L. c. 21E, § 15, which advances the purposes of G. L. c. 21E, deters forum shopping between Federal and State courts, and avoids any inconsistency with G. L. c. 21E, § 4A, inserted by St. 1992, c. 133, § 294. [318-324]


CIVIL ACTION commenced in the Superior Court Department on November 17, 1989.

Motions for summary judgment were heard by *Patrick F. Brady*, J., and the case was tried before him.

The Supreme Judicial Court on its own initiative transferred the case from the Appeals Court.

*Robert H. Greene* for Haigh-Farr, Inc.

*Charles E. Blumsack* (*Richard M. Canzano* with him) for Charles E. Farr.

*Arthur P. Kreiger* for the plaintiffs.

GREANEY, J. The plaintiffs brought an action in the Superior Court against the defendants, Haigh-Farr, Inc. (Haigh-Farr), and Charles E. Farr (Farr), for damages and costs resulting from the release of hazardous materials on property owned by the plaintiffs in Cambridge.[4] The complaint stated claims under the Federal Comprehensive Environmental Response Compensation and Liability Act of 1980 (CERCLA), 42 U.S.C. §§ 9601-9675 (1994), and the Massachusetts Oil and Hazardous Material Release Prevention Act, G. L. c. 21E, as well as common law claims for nuisance, strict liability, and negligence. On the defendants' motions for summary judgment, the CERCLA claim was

---

[4]Claims against several other defendants were settled for a total of $18,000. As a result, the plaintiffs and the present defendants are the only parties who participated in the trial and are involved in this appeal.

dismissed for lack of jurisdiction, and the common law claims, and a claim for property damages under G. L. c. 21E, § 5, were dismissed as barred by the statute of limitations. Summary judgment was denied for the claim brought under G. L. c. 21E, § 4, and the action proceeded to trial on that claim. In their answers to special verdict questions, the jury found that each defendant had been an operator of the business at the site. The jury determined that in responding to the release of hazardous wastes, the plaintiffs had incurred reasonable costs of $385,698.60, and that payment of the costs should be allocated in equitable shares: 30% to the plaintiffs, 35% to Haigh-Farr, and 35% to Farr. In response to posttrial motions, the judge deducted $18,000 from the total costs to reflect settlements that had been reached with other defendants, see note 4, *supra*, and entered judgment for the balance against the defendants severally, according to the percentages set by the jury (i.e., $128,694.51, plus $72,302.69 for prejudgment interest, against each defendant). The judge also approved the plaintiffs' motion to award attorney's fees and costs under G. L. c. 21E, § 15, in the amount of $290,400.47, and ordered payment of that amount by the defendants, jointly and severally. The defendants appealed, and the plaintiffs cross-appealed. We transferred the appeals to this court on our motion. We vacate the verdict and the judgment, and remand for a new trial.

The property at issue, consisting of land and a building, has been owned by the plaintiffs since May, 1982, when they purchased it from the Concord Turnpike Realty Trust (the principals of which were the plaintiffs' father and two uncles). Farr had been a tenant at the site since 1973, when he began to operate a furniture stripping business. The stripping process involved applying chemicals to the furniture and rinsing the chemicals off with water. The resulting mixture drained into an underground concrete storage tank.[5] Periodically, Farr hired a contractor to remove and dispose of the liquid and sludge in the tank. The parties agree that the chemicals

[5]The tank had been used by previous tenants, and its availability had been a factor in Farr's rental of the property for a furniture stripping operation. Evidence showed that, after the plaintiffs acquired the property in 1982, at least one of the plaintiff trustees visited Farr's business and observed the process. It cannot be disputed, therefore, that the plaintiffs were aware of the tank's presence and its use by Farr.

used in the stripping process were hazardous materials as defined by G. L. c. 21E. Farr was aided in the financing and conduct of his business by Haigh-Farr, one of whose principals was Farr's brother, George.

In 1986, the plaintiffs contemplated an exchange of properties with a neighboring owner, Arthur D. Little, Inc., which hired an environmental consultant to investigate the site. After a preliminary assessment of the site revealed soil contamination, the plaintiffs terminated Farr's tenancy, and he vacated the building on July 1. Following further investigation by a second consultant, the plaintiffs reported the contamination to the Department of Environmental Quality Engineering (DEQE),[6] and were notified on November 5, 1986, that they were responsible for the removal of the hazardous materials. This action was not brought until November 17, 1989.

With this background in mind, we proceed to consider the issues raised on appeal by the defendants, and on cross appeal by the plaintiffs.

(a) *Interaction of G. L. c. 21E, §§ 4 and 5.* As mentioned above, summary judgment had been granted to the defendants on the plaintiffs' claims for property damages brought under G. L. c. 21E, § 5. Farr argues that he must prevail on the claim for reimbursement brought under G. L. c. 21E, § 4, because (he contends) liability under § 4 is predicated on a showing of liability under § 5, a determination that was never made. We reject this argument. From the structure of the statute and the outcomes of previous cases, it is clear that a plaintiff is not required to establish liability under a § 5 claim in order to succeed on a § 4 claim.

At the time that this action commenced, the relevant text of G. L. c. 21E, § 4, inserted by St. 1983, c. 7, § 5, read as follows:[7]

> "Any person who undertakes assessment, containment or removal action regarding the release or threat of

[6]The Department of Environmental Quality Engineering has since been renamed the Department of Environmental Protection (DEP). St. 1989, c. 240, § 101.

[7]In 1992, G. L. c. 21E was extensively amended by St. 1992, c. 133, §§ 271-311. The parties agree that this action is governed by the statute in effect in 1989.

release of oil or hazardous material shall be entitled to
reimbursement from any other person liable for such
release or threat of release for the reasonable costs of such
assessment, containment and removal. If such release
resulted from the negligence of two or more persons, each
shall be liable to the others for his pro rata share of the
costs of assessment, containment and removal."

Persons liable for hazardous material releases are those who
come within the categories listed in G. L. c. 21E, § 5 (*a*) (1)-
(5).[8] Under § 5 (*a*) (1), liability applies to the "owner or opera-
tor" of a "site from or at which there is or has been a release or
threat of release of oil or hazardous material"; under § 5 (*a*)
(2), liability extends to "any person who at the time of storage
or disposal of any hazardous material owned or operated any
site at or upon which such hazardous material was stored or
disposed of and from which there is or has been a release or
threat of release of hazardous material."

Farr contends that, to be a "person liable" for the purposes
of § 4, one must have been found liable (i.e., adjudicated as
such) in an action brought under § 5. This is not a correct
interpretation of the interaction between the two sections. Any
person who falls within one of the categories of liability listed
in § 5 may be subject to an action brought under § 4, without
a separate finding of liability under § 5. Often, as in this case,
the defendant in a § 4 action will argue that it does not fall
within one of the § 5 categories, and that issue can be readily
addressed within the proceedings on the § 4 claim. If we
were to adopt Farr's reasoning, a party wishing to pursue a
§ 4 claim would need a basis as well for a § 5 claim, and
would have to bring both claims within the statutory period
allowed for § 5 claims. This would not be a logical reading of
the statute.[9] Similar conclusions have been reached in prior
cases that have often involved separate § 4 actions. See
*Mailman's Steam Carpet Cleaning Corp.* v. *Lizotte*, 415 Mass.

---

[8]"Person" is defined, in G. L. c. 21E, § 2, to include (among others) a
corporation, partnership, or trust.

[9]One 1992 amendment to c. 21E inserted § 11A, which provided various
limitations periods for actions brought under the different sections of the
chapter. St. 1992, c. 133, § 309. The new section therefore clarifies, by statu-
tory provision, that a § 4 claim might be timely when a § 5 claim is not.

865, 873-874 (1993) (person liable for cleanup under § 5 can sue other liable parties under § 4 for reimbursement of cleanup costs already paid, but cannot sue under § 5 [*a*] [5] [iii] to recover costs not yet incurred); *Griffith* v. *New England Tel. & Tel. Co.*, 414 Mass. 824, 826-829 (1993), *S.C.*, 420 Mass. 365, 367-370 (1995) (costs not recoverable in § 4 action from defendant who does not fit within any § 5 [*a*] category); *Oliveira* v. *Pereira*, 414 Mass. 66, 73-74 (1992) (causes of action for reimbursement under § 4 accrue on dates when cleanup costs paid, not when contamination discovered); *Sheehy* v. *Lipton Indus.*, 24 Mass. App. Ct. 188, 197-198 (1987) (plaintiff need not wait for State to seek damages or approve corrective measures before asserting § 4 reimbursement claim against defendant).

(b) *Liability of Haigh-Farr as "operator."* Haigh-Farr contends that there was insufficient evidence, as matter of law, to support the jury's finding that Haigh-Farr was "an operator of the furniture stripping business at any time when the hazardous materials were stored or disposed of at this site," and that the judge therefore erred in denying its motions for directed verdict and for judgment notwithstanding the verdict. Haigh-Farr also argues that the judge erred in instructing the jury on the appropriate "test" to be applied in determining "operator" liability. We conclude that the test set forth in the jury instructions incorrectly stated the requirements for establishing operator liability under G. L. c. 21E. Because the jury's finding may have been based on an incorrect application of law, we must vacate the verdict.[10] However, we also conclude that the plaintiffs have presented sufficient evidence to obtain jury consideration of their claim against Haigh-Farr under the appropriate test, and they are therefore entitled to a new trial.

The "[o]perator" of a site is circularly defined in G. L. c. 21E, § 2, as "any person . . . operating such site." It was never disputed at trial that Farr was an operator of the site; he was physically present at the site, supervised other em-

---

[10]We reject the plaintiffs' argument that Haigh-Farr failed to preserve its objection to the jury instruction on operator status. Haigh-Farr explained its disagreement with the judge's proposed instructions at a precharge conference and requested alternate instructions, and it properly stated its objection on the record at a bench conference immediately following the charge to the jury, before the jury retired. See Mass. R. Civ. P. 51 (b), 365 Mass. 816 (1974).

ployees, and actively managed the furniture stripping business.
The degree of Haigh-Farr's involvement in the business was, by
contrast, very much a matter of dispute, as were the legal
implications of that involvement.

In 1973, when he decided to open a furniture stripping busi-
ness, Farr had neither capital nor prior experience in manag-
ing a business. He turned for assistance to Haigh-Farr, whose
officers and sole stockholders were William B. Haigh and
Farr's brother, George. Haigh-Farr gave Farr the capital he
needed to start the business, in the form of an undocumented
loan, estimated at trial as between $6,000 and $10,000; there
was testimony that $5,000 was repaid in 1980. (Farr did not
incorporate his business; he operated it under the name
"Furniture Stripping Service.") After Farr's initial contact
with the site's owners (the predecessors to the plaintiffs), Wil-
liam Haigh negotiated the rental terms on Farr's behalf.[11]
Haigh-Farr in fact made all the rental payments for over nine
years until September, 1982, when it notified the plaintiffs
(who had purchased the property about six months earlier)
that it was "no longer associated" with Farr's business, and
that the rental payments would thereafter be paid directly by
Farr's business to the plaintiffs. Haigh-Farr provided other as-
sistance to Farr's start-up company: Haigh-Farr filed two busi-
ness certificates with the city of Cambridge before Farr filed
one of his own, and Haigh-Farr agreed to be responsible to
certain creditors, such as utility companies. Furthermore,
Farr's receipts were deposited in Haigh-Farr's bank account,
and some of Farr's expenses were paid by checks drawn on
that account. Although Haigh-Farr personnel kept separate
sets of books for the two businesses, it could be inferred from
the evidence that Haigh-Farr absorbed Farr's losses in his
business's early years and retained the profits thereafter. There
were also transactions involving Farr and Haigh-Farr that
were not fully explained, but appeared designed to achieve tax
benefits. These included funds transferred from Haigh-Farr to
Farr and then turned back to Haigh-Farr for investment in a
profit-sharing trust, and a complicated transaction involving
an equipment sale and leaseback by Haigh-Farr. There
was no evidence that Haigh-Farr or its principals ever

---

[11]At trial, none of the parties was able to produce a signed copy of a lease.
Haigh-Farr possessed an unsigned copy, which contained space for a signature
by a representative of Haigh-Farr, not Farr himself.

participated in the day-to-day management of Farr's business or made any decisions concerning personnel, materials purchasing, processing techniques, or pricing. William Haigh and George Farr were seldom present at the site. Haigh-Farr's own line of business was wholly unrelated to Farr's: Haigh-Farr performed research and development concerning mircowave components for the aerospace industry.

In the absence of prior cases on determining "operator" status under G. L. c. 21E, the judge looked to the experience of Federal courts in addressing the parallel definitional problem in CERCLA cases.[12] The definition of "operator" is no more helpful in the Federal than in the State legislation; CERCLA defines an operator as "any person . . . operating such facility."[13] 42 U.S.C. § 9601(20)(A). A number of cases have reached United States District Courts and Courts of Appeals in which plaintiffs have sought to hold a parent corporation[14] liable as an owner or operator of a facility owned or operated by a subsidiary.[15] We focus here on operator status, since in the present case the plaintiffs asserted that the defendants were liable as operators, not as owners.[16] The United States Courts of Appeals have proposed several differ-

---

[12]CERCLA and G. L. c. 21E have similar objectives and overlap in coverage. To the extent that there are similarities in language and structure, it is desirable to arrive at similar interpretations, to achieve consistency in application and to discourage "forum shopping." We are, of course, not bound to follow holdings in CERCLA cases when interpreting c. 21E, and there are provisions in the two statutes that do not mirror each other as closely as do the provisions for operator status.

[13]CERCLA uses the term "facility," and G. L. c. 21E the term "site," to refer to the location of the hazardous waste storage, disposal, or release. Any possible difference between the terms is insignificant to this case.

[14]In some cases, the party against whom liability was asserted was a government agency. See, e.g., *FMC Corp. v. United States Dep't of Commerce*, 29 F.3d 833 (3d Cir. 1994). See also note 43, *infra*.

[15]In looking to these cases for guidance, we do not mean to indicate how best to characterize the business relationship between Farr and Haigh-Farr; that is for a fact finder to determine. Obviously, the unincorporated status of Farr's business stands in the way of describing it as a subsidiary of Haigh-Farr.

[16]A parent corporation may be considered as *directly* liable for the release of hazardous materials from a facility if it has the status under CERCLA of an *operator* of that facility, and *indirectly* liable if circumstances justify "piercing the corporate veil" under traditional corporate law doctrines and treating the parent corporation, rather than the subsidiary, as the *owner* of the facility. See Oswald, Bifurcation of the Owner and Operator Analysis

ent standards by which to measure the liability of a parent corporation.[17] Most of the decisions may be characterized as applying one of the "tests" next discussed (although there are variations in the holdings represented within these classifications).

(i) *"Actual control" test.* The parent corporation may be held directly liable for its activities as an operator where there is "active involvement in the activities of the subsidiary." *United States* v. *Kayser-Roth Corp.*, 910 F.2d 24, 27 (1st Cir. 1990), cert. denied, 498 U.S. 1084 (1991). "To be an operator requires more than merely complete ownership and the concomitant general authority or ability to control that comes with ownership." *Id.* Actual, substantial control over the activities of the other corporation is required, not merely the authority or capability to control. *Lansford-Coaldale Water Auth.* v. *Tonolli Corp.*, 4 F.3d 1209, 1221 (3d Cir. 1993). The fact finder must consider the extent of involvement in the other corporation's day-to-day operations and policymaking decisions. *Id.* at 1222. Factors to consider include control of the facility's finances, employees, and daily business operations; responsibility for maintenance of its environmental controls; and receipt of economic benefits from the facility. *United States* v. *New Castle County*, 727 F. Supp. 854, 869 (D. Del. 1989). Representation of the parent's employees among the officers and directors of the subsidiary is also significant. *John S. Boyd Co.* v. *Boston Gas Co.*, 992 F.2d 401, 408 (1st Cir. 1993). See *Jacksonville Elec. Auth.* v. *Bernuth Corp.*, 996 F.2d 1107, 1110-1111 (11th Cir. 1993) (no operator liability unless "actual and pervasive control" exercised through involvement in daily activities).

(ii) *"Authority to control" test.* Operator status may apply where the company had the authority or capacity to control hazardous waste management. See *Nurad, Inc.* v. *William E.*

Under CERCLA: Finding Order in the Chaos of Pervasive Control, 72 Wash. U. L.Q. 223, 235-237 (1994).

[17]The United States Supreme Court has not resolved the conflict among the decisions of the Courts of Appeals, and has denied certiorari in several cases. See *Nurad, Inc.* v. *William E. Hooper & Sons*, 966 F.2d 837 (4th Cir.), cert. denied sub nom. *Mumaw* v. *Nurad, Inc.*, 506 U.S. 940 (1992); *Joslyn Mfg. Co.* v. *T.L. James & Co.*, 893 F.2d 80 (5th Cir. 1990), cert. denied, 498 U.S. 1108, and cert. denied sub nom. *Powerline Supply Co.* v. *T.L. James & Co.*, 498 U.S. 1108 (1991); *United States* v. *Kayser-Roth Corp.*, 910 F.2d 24 (1st Cir. 1990), cert. denied, 498 U.S. 1084 (1991).

*Hooper & Sons*, 966 F.2d 837, 842-843 & n.3 (4th Cir.), cert. denied sub nom. *Mumaw* v. *Nurad, Inc.*, 506 U.S. 940 (1992) (previous tenants not liable where leases conferred no authority or control over underground storage tanks); *Kaiser Aluminum & Chem. Corp.* v. *Catellus Dev. Corp.*, 976 F.2d 1338, 1341 (9th Cir. 1992) (operator liability if defendant contractor had authority to control cause of contamination at time of release); *State* v. *Bunker Hill Co.*, 635 F. Supp. 665, 671-672 (D. Idaho 1986) (parent corporation liable as operator if it had capacity to control hazardous waste practices).[18]

In the present case, the judge instructed the jury to apply the "authority to control" test.[19] We conclude, however, that the "actual control" test should be followed in determining operator status for the purposes of G. L. c. 21E. We consider

---

[18]Some decisions have adopted stricter standards than either of the two tests just described, before a parent corporation may be held liable as an operator. See *United States* v. *Cordova Chem. Co. of Mich.*, 59 F.3d 584, 590, judgment vacated, 67 F.3d 586 (1995), *S.C.*, 113 F.3d 572 (6th Cir. 1997) (parent corporation liable as operator only if circumstances justify "piercing the corporate veil" of limited liability); *Joslyn Mfg. Co.* v. *T.L. James & Co.*, 893 F.2d 80, 82-83 (5th Cir. 1990) (parent corporations do not come within CERCLA definition of owners or operators).

[19]The relevant portion of the jury instructions, reproduced in the trial transcript, reads as follows:

"In order for Haigh-Farr, Inc. to be considered as operating such site, Haigh-Farr must have had the authority to control, and I note, not actual control but, rather, the ability to control the operations or decisions involving the disposal of hazardous materials at the site.

"Put another way. If Haigh-Farr could have prevented the hazardous waste discharge at issue, then Haigh-Farr may be considered to be an operator. Now, in determining whether Haigh-Farr had the authority to control — now, that's the operative phrase there — authority to control Charles Farr's waste handling practices, you may consider the relationship between Haigh-Farr and Charles Farr.

"In this regard, you may consider evidence of the parties' positions, the distribution of power in their relationship, sharing of profits and losses, if any, evidence of responsibility undertaken for Charles Farr's business obligations, the scope of Haigh-Farr's involvement in Charles Farr's business practices, and evidence of responsibility undertaken for waste disposal."

The judge added that the business certificates filed with the city of Cambridge were relevant to whether Haigh-Farr was an operator, but were not dispositive or conclusive of the issue.

the "actual control" test to be the more widely-adopted and better-reasoned approach, and the one which "appears to strike the appropriate middle ground, balancing the benefits of limited liability with [G. L. c. 21E]'s remedial purposes." *Lansford-Coaldale, supra* at 1221. Our adoption of the "actual control" test also has the advantage of providing consistency with the treatment of CERCLA cases in the United States Court of Appeals for the First Circuit, which first formulated the test in the *Kayser-Roth* case. Therefore, for Haigh-Farr to be a person liable for response costs on the basis of its status as an operator of the site at a time when hazardous materials were stored or disposed of at the site, the plaintiffs must prove that Haigh-Farr had actual control of, and active involvement in, operations at the site.[20] This is a fact-specific determination, and the appropriate factors to consider will differ according to the nature of the enterprise and the relation between the parties involved. Haigh-Farr is, obviously, less likely to be found liable as an operator under the "actual control" test than under the "authority to control" test that the jury were instructed to apply. Nonetheless, Haigh-Farr was not entitled to a directed verdict or to judgment notwithstanding the verdict. In reviewing the denial of those motions, the standard is "whether 'anywhere in the evidence, from whatever source derived, any combination of circumstances could be found from which a reasonable inference could be drawn in favor of the plaintiff'. . . . In applying this standard, we examine the evidence in the light most favorable to the plaintiff." *Forlano* v. *Hughes*, 393 Mass. 502, 504 (1984), quoting *Miles* v. *Edward O. Tabor, M.D., Inc.*, 387 Mass. 783, 786 (1982). A finding by a jury that Haigh-Farr was an operator, if based on a correct instruction defining that term, could conceivably have met this standard on the evidence presented at trial. Therefore, although the jury's

---

[20]We draw one potential distinction between our position and that of the United States Court of Appeals for the First Circuit: we emphasize that what is at issue, under G. L. c. 21E, is whether a party is the operator of a *site* (in CERCLA terms, a facility), not whether it is the operator of the subsidiary *business*. See Oswald, *supra* at 269-273. Where the subsidiary business is limited to one type of activity conducted at a single site, this may well be a distinction without a difference.

verdict must be vacated, the plaintiffs are entitled to a new trial.[21]

(c) *Procedure for allocating response costs.* On the special verdict form, the jury were first asked whether a release of hazardous materials had occurred during or after Farr's operation of the furniture stripping business (question 1), and whether Haigh-Farr had been an operator (question 2). They were then asked whether, as the result of such a release, the plaintiffs had incurred response costs[22] (question 3), and what the dollar amount was of the "reasonable" response costs (question 4). The jury were next asked, "Were the plaintiffs negligent with respect to their care and maintenance of the underground storage tank?" (question 5), and, "If so, was the plaintiffs' negligence a cause of the release(s) of hazardous materials from the tank?" (question 6). Finally, the jury were asked, "What is the equitable share of plaintiffs' reasonable response costs that each party should be required to pay?" (question 7); the jury were instructed to set down percentages for each party, such that the three shares totalled 100%.[23] After answering the first three questions affirmatively and finding that the amount of the reasonable response costs was $385,698.60, the jury found, in response to questions 5 and 6, that the plaintiffs had been negligent, and that their negligence had been a cause of the release. In response to question 7, the

---

[21]The plaintiffs argue that the judge erred in failing to instruct the jury that Haigh-Farr could also be found liable, under G. L. c. 21E, § 5 (*a*) (5), if it "caused or [was] legally responsible for" the release. The judge was correct in refusing to give the instruction, based on the facts of the case as presented in evidence. Not knowing what evidence would be offered in a new trial, we cannot determine in advance whether the instruction sought by the plaintiffs would then be warranted.

[22]"Response" is defined in G. L. c. 21E, § 2, as including assessment, containment, and removal, and so the term "response costs" is equivalent to the costs of "assessment, containment and removal" specified in the earlier language of § 4. The text of § 4, as amended through St. 1992, c. 133, § 293, now refers to the costs of a "response action."

[23]There is no dispute that the plaintiffs, although referred to in the plural here and in the record, constitute a single entity and are one "person" as the term is used in G. L. c. 21E. Thus, question 7 called for assigning a single share to the "plaintiffs" collectively.

jury set the plaintiffs' share of the response costs at 30%, and those of Haigh-Farr and Farr at 35% each.[24]

The plaintiffs argue that, under a proper interpretation of G. L. c. 21E, § 4, the incurrer of response costs should recover 100% of those costs from other liable persons, regardless of the extent of the incurrer's own responsibility for the release. They argue that this provides a necessary incentive for a party to respond to contamination, and thereby furthers the statute's purposes, including the "prompt and efficient cleanup of hazardous material." *Sheehy* v. *Lipton Indus.*, *supra* at 197. As indicated above, the judge instead asked the jury to allocate the response costs equitably among the three parties in the case. The plaintiffs further argue that joint and several liability should apply to the total amount of the award against the defendants (whether that award represented the total response costs sought by the plaintiffs, or the 70% assessed against the defendants by the jury). In his memorandum and order on posttrial motions, the judge decided that the defendants should not be held jointly and severally liable, and entered judgment against each for 35% of the costs. We agree with the judge's decisions to ask the jury for an equitable allocation of the response costs and to enter judgment against the defendants severally. In reaching this conclusion, we have considered several interrelated issues that have emerged in cases applying G. L. c. 21E, as well as the parallel CERCLA statute, 42 U.S.C. §§ 9601-9675.

(i) *Response cost recovery as an action for contribution.* The key issue in determining the allocation of response costs is how to characterize an action brought under G. L. c. 21E, § 4, to recover those costs. Such an action can be viewed as either an action in tort *against* joint tortfeasors, or as an action for contribution *among* them. According to the first "tort" model, favored by the plaintiffs, a contribution action is pictured as a tort claim brought by a plaintiff for response costs against defendants who are jointly and severally liable to the plaintiff, under § 5 of c. 21E, for the amount of those costs. Under this tort model, in this case the defendants are tortfeasors, and the plaintiffs are not. Under the alternative "contribution" model, implicitly followed by the judge, an ac-

---

[24]Before allocating the response costs to the parties according to the percentages established by the jury, the judge first deducted the amounts of settlements reached with other defendants. See note 4, *supra.*

tion to recover response costs is viewed as one in which the plaintiff finds itself liable in tort to the government for the entire costs of the cleanup and therefore seeks to force other tortfeasors to contribute a share of those costs. Under this model, the plaintiffs and the defendants in this case are all tortfeasors.

In form, this case is an action in tort; in substance, it conforms better to the contribution model. The objection might be raised that no tort judgment has been made against the plaintiffs in this case, such as to furnish the basis for a contribution action. See *Berube* v. *Northampton*, 413 Mass. 635, 638 (1992) ("Contribution claims are derivative and not new causes of action. Without liability in tort there is no right of contribution"). However, in this case, issuance to the plaintiffs by DEQE of a notice of responsibility informed them of their liability to the Commonwealth. If the plaintiffs had not undertaken a response action, the State could have done so on its own and sought repayment from the plaintiffs.[25] In substance, then, the plaintiffs had been informed of their liability in tort under G. L. c. 21E, § 5, and they brought an action under § 4 to require contribution from other liable parties. See *Oliveira* v. *Pereira*, 414 Mass. 66, 72-73 (1992) ("Determining liability for contamination is not the focus of § 4 of [c. 21E]. The language of the section *presupposes* liability . . . . Section 4 simply allows for reimbursement of expenditures made. . . . The statute, *read as a whole*, suggests that the essential nature of claims under G. L. c. 21E sounds in tort." [Emphases added]). See also *Hazen Paper Co.* v. *United States Fid. & Guar. Co.*, 407 Mass. 689, 691-697 (1990) (letter from United States Environmental Protection Agency [EPA], notifying insured party of liability for hazardous waste release, is analogous to a complaint, and invokes insurer's duty to defend "suit against the insured seeking damages").

Applying this conceptual model to the language of the pre-1992 version of G. L. c. 21E, § 4, is not without its difficulties. The two adjacent sentences of § 4 previously quoted reflect discordant theories of strict liability and negligence. The first quoted sentence establishes a right of reimbursement

---

[25]Under the terms of G. L. c. 21E, § 5 (*e*), in effect in 1986, the plaintiffs could have been liable for up to three times the State's actual response costs.

against "any other person liable" for a release; such persons are, by the terms of § 5 (*a*), liable "without regard to fault," i.e., strictly, to the Commonwealth for any response costs it incurs and for damages to natural resources, and to any person for damage to his property. However, the second sentence in the quoted portion of § 4 refers to releases resulting from the "negligence" of two or more persons, and prescribes that each such person is liable to the others for his "pro rata share" of the response costs. This reference to negligence is somewhat inconsistent not just with the prior sentence, but with the very structure of G. L. c. 21E as a strict liability statute that imposes responsibility on the basis of status and does not require a showing of fault. A literal application of the statutory language would lead to an absurd result,[26] and we therefore look for guidance to other provisions of the statute and to the aim and object of the legislation. *Lexington* v. *Bedford*, 378 Mass. 562, 570 (1979), and cases cited. The structure of G. L. c. 21E allows the Commonwealth to make one liable party entirely responsible for a cleanup, leaving the final allocation of costs among all the liable parties dependent on the outcome of a private action under § 4. We conclude, as did the judge, that for the purposes of construing § 4, "negligence" should be understood to mean "liable." Although the amended language of a statute does not control its prior meaning as the amendment may either clarify prior law or change it, we note that this interpretation is consonant with the current language of the portion of § 4 in question, which has been amended through St. 1992, c. 133, § 293, to read as follows:

[26]The trial tactics of both sides in this action, which they evidently believed to be necessitated by the statutory language, demonstrate the difficulties in applying that language literally. The special verdict questions relating to the plaintiffs' negligence were proposed by the defendants to establish a basis for imposing a share of the response costs on the plaintiffs, but the plaintiffs were already liable to the Commonwealth for all the costs without any showing of negligence. The plaintiffs, for their part, did not seek verdict questions on negligence by the defendants, and now argue that no cost sharing can occur because only one person (i.e., the plaintiffs) has been found negligent, not "two or more." Were we to follow the plaintiffs' reasoning, a negligent defendant would be entitled to cost sharing with a negligent plaintiff, but a nonnegligent defendant (liable by reason of status only) would have to bear the cost alone. This is not a logical or sensible outcome.

"Any person who undertakes a necessary and appropriate response action regarding the release or threat of release of oil or hazardous material shall be entitled to reimbursement from any other person liable for such release or threat of release for the reasonable costs of such response action. If two or more persons are liable pursuant to section five for such release or threat of release, each shall be liable to the others for their equitable share of the costs of such response action. . . ."

In this instance, we have recognized that the 1992 amendments "more clearly defined the nature of an action under § 4 of [c. 21E]." *Oliveira* v. *Pereira, supra* at 72 n.9.[27] Given the ambiguous prior language of § 4, legislative intent is best served, and a sensible and coherent interpretation achieved, by reading that language as authorizing an action for the sharing of response costs, i.e., contribution, among parties whose underlying liability to the Commonwealth is imposed by the provisions of § 5.[28]

In treating this case as an action for contribution, our conclusion is consistent with the trend of decisions in Federal courts that have encountered a similar problem when interpreting CERCLA. A provision of the original CERCLA statute, 42 U.S.C. § 9607 (commonly referred to as "§ 107"), established categories of liable persons,[29] and made such persons liable, with narrow exceptions, for "costs of removal

---

[27]DEP shares the view that St. 1992, c. 133, § 293, "clarifies the method of allocating contribution shares for response costs amongst liable parties." Hazardous Waste Cleanup Law, 2 Massachusetts Environmental Law at 22-116 (Massachusetts Continuing Legal Educ. Supp. 1996).

[28]In this case, the § 5 liability of the plaintiffs, as owners of the property, was conceded, and that of Farr and Haigh-Farr was determined by the jury in their affirmative answers to Questions 1 and 2 of the special verdict. That all three parties were *liable* did not mean, automatically, that all three were *responsible* for sharing the response costs; that shared responsibility was established by the jury's answer to Question 7. In other cases for reimbursement under § 4, a fact finder may well conclude that the plaintiff, although liable under § 5, should bear no responsibility for the response costs. See *Mailman's Steam Carpet Cleaning Corp.* v. *Lizotte*, 415 Mass. 865, 867, 874-875 (1993) (where land purchaser sued seller under c. 21E for cleanup costs and seller cross-claimed against prior owner, costs would not be equitably divided among three parties, because jury found prior owner to be sole party equitably responsible for costs incurred).

[29]Persons who are liable under 42 U.S.C. § 9607 are also referred to as "potentially responsible" persons or parties (PRP's). See 42 U.S.C. § 9622

or remedial action" incurred by a governmental unit, and for "any other necessary costs of response incurred by any other person." 42 U.S.C. § 9607(a)(4). That section did not explicitly provide for a private right of action to seek contribution or indicate whether a plaintiff in such an action would be entitled to recover all costs, regardless of that party's responsibility for the release of hazardous materials. Among the changes to CERCLA included in the Superfund Amendments and Reauthorization Act of 1986, Pub. L. 99-499, 100 Stat. 1613 (1986), was a provision that explicitly authorized actions for contribution. 42 U.S.C. § 9613(f) ("§ 113[f]").[30] A new issue then arose: whether a party seeking reimbursement for response costs from other liable parties must bring an action for contribution under § 113(f), or whether (and under what circumstances) it may instead seek recovery of all costs under § 107(a)(4).[31] Most of the United States Courts of Appeals that have addressed this issue have concluded that a party which is itself responsible in part for the release is limited to a § 113 action for contribution. See *Redwing Carriers, Inc.* v. *Saraland Apartments*, 94 F.3d 1489, 1496, 1513-1514 (11th Cir. 1996) (party not qualifying as "innocent" may only bring claim against other responsible parties under § 113, not § 107); *Control Data Corp.* v. *S.C.S.C. Corp.*, 53 F.3d 930, 934-935 (8th Cir. 1995) (private party cost recovery action involves two steps, proving liability under § 107 and seeking contribution under § 113); *United States* v. *Colorado &*

---

(a), (b). The language of CERCLA therefore makes explicit what is implicit in G. L. c. 21E as well: that liable parties are only *potentially* responsible for cleanup costs. See *Environmental Transp. Sys., Inc.* v. *Ensco, Inc.*, 969 F.2d 503, 507 (7th Cir. 1992).

[30]Section 113(f)(1), entitled "Contribution," reads, in part:

> "Any person may seek contribution from any other person who is liable or potentially liable under section 9607 (a) of this title, during or following any civil action under section 9606 of this title or under section 9607 (a) of this title. . . . In resolving contribution claims, the court may allocate response costs among liable parties using such equitable factors as the court determines are appropriate."

[31]Whether the defendants are liable jointly and severally may depend on which CERCLA section is the basis for the action. See *Redwing Carriers, Inc.* v. *Saraland Apartments*, 94 F.3d 1489, 1512-1514 (11th Cir. 1996). Also, different statutes of limitations apply, depending on the section involved. See 42 U.S.C. § 9613(g)(2), (3).

*E.R.R.*, 50 F.3d 1530, 1534-1536 (10th Cir. 1995) (cost recovery against liable party must be brought under § 113 [f], not under § 107); *United Technologies Corp.* v. *Browning-Ferris Indus.*, 33 F.3d 96, 99-101 (1st Cir. 1994), cert. denied, 513 U.S. 1183 (1995) (cost recovery and contribution actions are distinct, and a "non-innocent" party may only seek contribution); *Akzo Coatings, Inc.* v. *Aigner Corp.*, 30 F.3d 761, 764 (7th Cir. 1994) (where plaintiff is liable itself in some measure for contamination, its claim is "a quintessential claim for contribution"); *Amoco Oil Co.* v. *Borden, Inc.*, 889 F.2d 664, 672 (5th Cir. 1989) (suit by one liable party against another to recover response costs is an action for contribution).[32] Other United States Courts of Appeals have allowed a suit for cost recovery to be brought under § 107, but have understood § 113 as requiring that the costs be apportioned equitably among all the responsible parties. See *In re Dant & Russell, Inc.*, 951 F.2d 246, 248-249 (9th Cir. 1991); *Smith Land & Improvement Corp.* v. *Celotex Corp.*, 851 F.2d 86, 88-90 (3d Cir. 1988), cert. denied, 488 U.S. 1029 (1989).[33] The United States Courts of Appeals have, in some instances, allowed actions for full recovery to be brought under § 107 where the plaintiff is, arguably, not at all responsible for the contamination. See *Rumpke of Ind., Inc.* v. *Cummins Engine Co.*, 107 F.3d 1235, 1239-1242 (7th Cir. 1997) ("blameless" landowner may bring action under § 107); *AM Int'l, Inc.* v. *Datacard Corp.*, 106 F.3d 1342, 1346-1347 (7th Cir. 1997) (purchaser of contaminated site may bring § 107 action); *United Technologies Corp.*, *supra* at 100 ("Congress intended only innocent parties—not parties who were themselves li-

---

[32]The United States Court of Appeals for the Third Circuit may also adhere to this position. See *Transtech Indus.* v. *A & Z Septic Clean*, 5 F.3d 51, 55-56 (3d Cir. 1993), aff'g on procedural grounds, 798 F. Supp. 1079, 1085-1086 (D.N.J. 1992) (denying summary judgment and holding that action by one liable party against another must be brought under § 113[f]), cert. denied sub nom. *Mayco Oil & Chem. Co.* v. *Transtech Indus.*, 512 U.S. 1213 (1994).

[33]Some United States District Courts have allowed § 107 suits in which the defendants are jointly and severally liable, but the plaintiffs remain responsible for an equitably apportioned share of the response costs. See, e.g., *Pneumo Abex Corp.* v. *Bessemer & Lake Erie R.R.*, 921 F. Supp. 336, 347, *S.C.*, 936 F. Supp. 1250, 1268-1269, and 936 F. Supp. 1274 (E.D. Va. 1996); *Oshtemo* v. *American Cyanamid Co.*, 898 F. Supp. 506, 508 (W.D. Mich. 1995); *Chesapeake & Potomac Tel. Co. of Va.* v. *Peck Iron & Metal Co.*, 814 F. Supp. 1269, 1277 (E.D. Va. 1992).

able—to be permitted to recoup the whole of their expenditures").[34] None of those decisions is helpful to the plaintiffs here, who were found by the jury to bear partial responsibility for the contamination at the site.

Federal decisions also support our view that an action for contribution (under G. L. c. 21E, § 4) derives from a presumption of tort liability (under § 5), even in the absence of a suit or judgment. In *Akzo Coatings, supra* at 762, the plaintiff had been required to carry out response actions by an EPA administrative order issued under 42 U.S.C. § 9606. Commenting on that case, the *Rumpke* court observed, "[W]hen two parties who both injured the property have a dispute about who pays how much — a *derivative liability, apportionment dispute* — the statute directs them to § 113(f) and only § 113(f)" (emphasis added). *Rumpke, supra* at 1240. See *In re Hemingway Transp., Inc.*, 993 F.2d 915, 931 (1st Cir.), cert. denied sub nom. *Kahn v. Juniper Dev. Group*, 510 U.S. 914 (1993) (plaintiff who is potentially liable to EPA for response costs is akin to joint tortfeasor).

(ii) *Equitable allocation.* Having determined that the plaintiffs' claim is an action by one liable "person" for contribution from others toward its response costs, and that the pre-1972 language of G. L. c. 21E, § 4, does not relieve the cost incurrer of all responsibility for those costs, we next consider what formula or factors should be considered in allocating those costs among the parties. The jury were asked, in question 7 of the special verdict form, to assign an "equitable share" to each party. The judge suggested a list of factors to be considered. We conclude that this was an appropriate method for allocating the costs.

As formerly worded, G. L. c. 21E, § 4, stated that "each [person] shall be liable to the others for his pro rata share" of the response costs, but the statute did not define the term "pro rata." The term may be defined as "[A]ccording to a certain rate, percentage, or proportion. According to measure, interest, or liability." Black's Law Dictionary 1220 (6th ed. 1990). This meaning is followed in several of our statutes

---

[34]The United States Supreme Court has not resolved the issue. It has commented, in dictum, that "[CERCLA] now expressly authorizes a cause of action for contribution in § 113 and impliedly authorizes a similar and somewhat overlapping remedy in § 107." *Key Tronic Corp. v. United States*, 511 U.S. 809, 816 (1994).

that involve the allocation of fees or payments. See, e.g., G. L. c. 21C, § 29 (hazardous waste licensees to be assessed DEP's administrative costs, allocated according to "each licensee's pro rata share of the total amount of hazardous waste collection, treatment, disposal and storage within the commonwealth"). However, the term has sometimes been employed to mean "equal" or "per capita," as in G. L. c. 231B, which provides in § 1 (*b*) for a right of contribution in favor of a joint tortfeasor who has paid "more than his pro rata share of the common liability," and in § 2 directs that "[the tortfeasors'] relative degrees of fault shall not be considered" in determining their "pro rata shares."[35] See *Zeller* v. *Cantu*, 395 Mass. 76, 77-81 (1985) (under c. 231B, comparative fault not to be considered in assessing contribution, and hence one codefendant required to contribute 50% of judgment to the other).

We interpret "pro rata" as used in G. L. c. 21E to mean proportional to liability, according to equitable considerations. We have so indicated previously. See *Mailman's Steam Carpet Cleaning Corp.* v. *Lizotte, supra* at 874-875 (party which caused contamination is "equitably responsible" for entire statutory damages); *Sanitoy, Inc.* v. *Ilco Unican Corp.*, 413 Mass. 627, 630 (1992) (reimbursement from other parties to be "in proportion to their relative degrees of contribution to the contamination as a function" of total response costs). The current language of § 4, using the term "equitable share," conforms to this interpretation, as does § 113, the contribution provision of CERCLA, which directs that costs be allocated "using such equitable factors as the court determines are appropriate." 42 U.S.C. § 9613(f)(1). The judge in this case based the jury instructions on various criteria that have been suggested by Federal courts for allocating costs under

[35]None of the parties in this case argued at trial that G. L. c. 231B would apply to an action under G. L. c. 21E, § 4. Chapter 231B is a statute of general application, which displaced the common law rule that there was no right of contribution among tortfeasors. *Zeller* v. *Cantu*, 395 Mass. 76, 78 (1985); *Hayon* v. *Coca Cola Bottling Co. of New England*, 375 Mass. 644, 648 (1978). Chapter 21E is sui generis; it creates a distinctive procedure to be followed solely for apportioning costs that are imposed on persons made liable by G. L. c. 21E itself. Nonetheless, to the extent that it is not in conflict with G. L. c. 21E, G. L. c. 231B is indicative of legislative intent on the subject of contribution generally and so remains relevant to interpreting G. L. c. 21E.

§ 113, particularly the so-called "Gore factors."[36] The judge listed the following factors for the jury to consider in determining the parties' "relative degrees of contribution to the contamination":

> "[1] the degree of care exercised by the parties with respect to the hazardous material concerned . . . [2] the degree of involvement by the parties in the generation, storage or disposal of the hazardous materials. . . . [3] the amount of hazardous materials involved and how they were released into the environment. . . . [4] the knowledge and/or the acquiescence of the parties in the contaminating activities. . . . [5] the relative fault of the parties in causing the release of the hazardous materials . . . . [6] the period of time each of the parties actually owned or operated the site in relationship to when the releases occurred."

The judge told the jury that this list was not exhaustive or exclusive, and that they might "consider any factors appropriate to balance the equities in the totality of the circumstances."

The judge's instructions offered proper guidance to the jury for determining the parties' equitable, pro rata shares of the response costs. The contribution provision of G. L. c. 21E, § 4, requires the fact finder to assign degrees of culpability to parties who are, by the terms of § 5, strictly liable without regard to fault. Such an assessment must necessarily be done on a case-by-case basis. We choose not to prescribe the factors to be considered and the weight to be placed on them, as these will vary according to the particular circumstances.

---

[36]During debate on the original CERCLA bill in 1980, Congressman Albert Gore proposed an amendment to establish criteria which a court could evaluate in determining whether or not to impose joint and several liability. The amendment was not adopted. In 1986, when the contribution provision was proposed as part of the Superfund Amendments and Reauthorization Act, a House report cited the Gore criteria as factors that a court might consider in deciding whether to grant apportionment in a contribution action. See *Environmental Transp. Sys., Inc.* v. *Ensco, Inc.*, 969 F.2d 503, 508-509 (7th Cir. 1992) (text and background of Gore factors); *Central Me. Power Co.* v. *F.J. O'Connor Co.*, 838 F. Supp. 641, 645 (D. Me. 1993) (additional criteria). See also Wallwork & Carver, Spreading the Costs of Environmental Cleanup: Contribution Claims Under CERCLA and RCRA, SB73 ALI-ABA 173, 181-185 (1997).

(iii) *Several liability.* A party subject to contribution is liable only for its proportionate share, and the party seeking contribution may do so only for what it has paid in excess of such a share. See G. L. c. 231B, § 1 (*b*); Restatement (Second) of Torts § 886A (2) (1979). The plaintiffs argue that the defendants should be jointly and severally liable, allowing the plaintiffs to collect 70% of the response costs from either defendant, but the result would be a series of unnecessary actions. Under the principles of contribution just described, neither defendant can be required to pay more than 35%; consequently, if the plaintiffs were allowed to collect 70% from one defendant, that defendant (having now paid more than its proportionate share) would in turn have a right of contribution against the plaintiffs for 35%.[37] (The problem of accounting for insolvent parties is discussed below.) Therefore, although persons who are subject to strict liability under G. L. c. 21E, § 5, for a hazardous waste release are jointly and severally liable, an action to require contribution among them under § 4 imposes several liability only.[38] This conclusion is supported by decisions of Federal courts relating to CERCLA § 113 actions. See, e.g., *Redwing Carriers, Inc.* v. *Saraland Apartments*, 94 F.3d 1489, 1512-1514 (11th Cir. 1996); *Saco Steel Co.* v. *Saco Defense, Inc.*, 910 F. Supp. 803, 809 (D. Me. 1995); *Plaskon Elec. Materials, Inc.* v. *Allied-Signal, Inc.*, 904 F. Supp. 644, 651 (N.D. Ohio 1995).

(iv) *Allocation of "orphan shares."* The plaintiffs raise the concern that one or the other of the defendants may be insolvent, and that in the absence of joint and several li-

---

[37]The illogic of allowing joint and several liability in an action for contribution is discussed in detail in Olin Corp. *vs.* Fisons PLC, U.S. Dist. Ct. No. 93-11166-MLW (D. Mass. April 24, 1995) (report and recommendation).

[38]The plaintiffs argue that the imposition of joint and several liability in this case is supported by *Oliveira* v. *Pereira*, 414 Mass. 66 (1992). In *Oliveira*, the plaintiff had appealed from a judge's decision that the statute of limitations barred the claim which the plaintiff had brought under G. L. c. 21E, § 4. We reversed and remanded, based on our conclusions concerning the proper application of the statute of limitations. *Id.* at 64, 67. In summarizing the judge's findings of fact, we noted that the judge had declared the defendants to be jointly and severally liable for the response costs. *Id.* at 70. That finding was not the subject of the appeal, and we neither considered nor reached any conclusion as to its validity.

ability, the burden of this uncollectible "orphan share"[39] would fall wholly on the plaintiffs. The plaintiffs' concern is not without merit; the prompt cleanup of hazardous waste releases would be hindered if the party undertaking the cleanup bore all the risk of nonpayment by insolvent or defunct entities. However, the solution proposed by the plaintiffs, that the burden of orphan shares should fall entirely on available solvent defendants, is contrary to the equitable nature of a contribution action, in which plaintiffs and defendants are both responsible for the underlying *common* burden or obligation. The most appropriate solution to the problem of orphan shares in a G. L. c. 21E, § 4, action is to allocate them among the available parties on an equitable basis. As with the initial allocation of shares among the liable parties, the reallocation of orphan shares will require balancing the equities among the available parties based on a number of factors, and will require a case-by-case determination. This conclusion is supported by (1) our past decisions on contribution in nontort contexts, (2) statutory provisions for contribution in tort actions and comments by authorities, and (3) Federal court decisions in CERCLA cases where this issue has arisen.

---

[39]We use the term "orphan share" to mean the amount for which a liable party should be responsible under an equitable allocation procedure, but which cannot be collected because the party is insolvent, unidentifiable, or otherwise unreachable. It does not apply to solvent, liable persons who have not been made parties to the action, although the effect of their absence is the same: to raise the amounts due from the parties involved in the action. By placing both plaintiffs and defendants at risk for amounts not collected from nonparties, an incentive is created for pursuing all potentially liable persons. See *United States* v. *Kramer*, 953 F. Supp 592, 595 (D.N.J. 1997) (defining orphan share as "gap" between party's ideal and actual share).

The parties to an action might also have to pay more if settlements with other liable persons are for lesser amounts than would have been allocated to those persons had they not settled. To encourage cooperation with enforcement agencies, liable persons who reach settlements with the State and Federal governments for public cleanup costs are protected under G. L. c. 21E, § 3A (*j*), and 42 U.S.C. § 9613(f)(2), respectively, from private contribution actions. No such protection is provided to parties who settle with the person bringing the contribution action. In this case, Farr and Haigh-Farr did not object to the amounts of the settlements between the plaintiffs and other defendants, and those amounts were deducted from the total response costs before the balance of those costs was allocated among the parties.

(1) We long ago decided that in an equitable action for contribution, one who paid a debt could seek contribution from all solvent codebtors within the court's jurisdiction for shares calculated on the whole amount of the debt. *Cary* v. *Holmes*, 16 Gray 127, 129 (1860). Thus, the amounts that would otherwise have been paid by insolvent parties were to be shared, and not placed wholly on either the payor or the codebtors. See *Tait* v. *Downey*, 267 Mass. 422, 430 (1929) (plaintiff, defendant, and a third solvent indorser must each contribute one-third of amount paid to discharge note); *Putnam* v. *Misochi*, 189 Mass. 421, 423-424 (1905) (stockholder liable under Maine statute for judgment against corporation may seek contribution from solvent defendants within Massachusetts).

(2) The same principle of equitable sharing has been adopted for contribution among joint tortfeasors. See G. L. c. 231B, § 2: "In determining the pro rata shares of tortfeasors in the entire liability . . . (*c*) principles of equity applicable to contribution generally shall apply." This provision was intended to cover the situation of insolvent contributors, *Zeller* v. *Cantu*, *supra* at 81-82, and to allow such situations to be resolved by the courts as in contract contribution cases. Comment to Uniform Contributions Among Tortfeasors Act § 2, 12 U.L.A. 246 (Master ed. 1996) (difficult and unwise to state express rule for all equitable situations which may arise). The principle is also supported by Restatement (Second) of Torts § 886A (2) comment c (1979):

> "Contribution is a remedy that developed in equity . . . . [W]hen there are three tortfeasors and one of them is clearly insolvent or is beyond the jurisdiction, the amount of contribution fairly allowable between the other two may reasonably be affected and the court may be expected to do what is fair and equitable under the circumstances."

(3) The problem of orphan shares has surfaced in a number of recent CERCLA cases. Although the solutions imposed by the courts have varied depending on the facts at hand, there has been a common assumption that § 113 allows a court to allocate orphan shares among the viable parties. See, e.g., *United States* v. *Kramer*, 953 F. Supp. 592, 600-601 (D.N.J.

1997) (consistent with several liability under § 113 to apportion orphan shares among all parties, including third-party defendants); *Pneumo Abex Corp.* v. *Bessemer & Lake Erie R.R.*, 921 F. Supp. 336, 347-348, *S.C.*, 936 F. Supp. 1250, and 936 F. Supp. 1274, 1278-1279 (E.D. Va. 1996) (defendants liable for any orphan shares); *Gould Inc.* v. *A & M Battery & Tire Serv.*, 901 F. Supp. 906, 913 (M.D. Pa. 1995) (defendants not liable for any orphan shares); *Oshtemo* v. *American Cyanamid Co.*, 898 F. Supp. 506, 508-509 (W.D. Mich. 1995) (shares of insolvent liable parties to be apportioned among all solvent parties, including plaintiffs, according to their relative equitable shares).

We therefore reject the plaintiffs' contention that the potential problem of orphan shares is a reason to impose joint and several liability on the defendants in this case. Should the need arise, orphan shares can be equitably allocated among all the parties in a G. L. c. 21E contribution action.

(d) *Award of attorney's fees and costs.* The judge granted the plaintiffs' posttrial motion for an award of attorney's fees and costs under G. L. c. 21E, § 15, and entered judgment against the defendants, jointly and severally, for $290,400.47, the full amount requested by the plaintiffs. The defendants object to this award on several grounds, including that (1) § 15 is inapplicable to this case, (2) a motion for attorney's fees and costs should not have been allowed where no such claim had been included in the amended complaint, (3) the award improperly includes attorney's fees and costs incurred in pursuing unsuccessful claims, and (4) joint and several liability should not have been imposed. Because we have vacated the jury's verdict and remanded for a new trial, we also vacate the award of attorney's fees and costs to the plaintiffs. We nonetheless address one of the issues raised by the defendants, the applicability of § 15 to this case, because it is likely to arise at a new trial. We conclude that if, in a new trial, the plaintiffs are found to be liable for an equitable share of the response costs, they will not be entitled to an award of attorney's fees and costs under § 15.[40]

Section 15 of G. L. c. 21E was inserted by St. 1986, c. 554,

---

[40]We comment briefly on the defendants' other arguments. The plaintiffs' claim for attorney's fees and costs had been referenced in the amended complaint and was properly considered by the judge on posttrial motion. No evidentiary hearing was required, but the judge's memorandum should

§ 3, which was proposed by initiative petition and approved by the voters at the State election on November 4, 1986. The section, which is entitled "Citizen Enforcement," reads:

"In any suit by Massachusetts residents to enforce the requirements of this chapter, or to abate a hazard related to oil or hazardous materials in the environment, the court may award costs, including reasonable attorney and expert witness fees, to any party other than the commonwealth who advances the purposes of this chapter."

We have construed this provision as authorizing a judge to award attorney's fees and costs to a party that brings a suit under § 4 for reimbursement of response costs. *Sanitoy, Inc.* v. *Ilco Unican Corp.*, 413 Mass. 627 (1992). The plaintiffs argue that our construction of § 15 in *Sanitoy* controls this case. We do not agree. The plaintiffs' (and the judge's) reading of our decision in *Sanitoy* would extend the coverage of § 15 to parties which the statute did not intend to be eligible for that provision's cost-shifting provision. Recognizing that the holding in *Sanitoy* may, when taken out of context, engender some confusion, we offer the following by way of clarification. The plaintiff in *Sanitoy* sought reimbursement for response costs on contaminated property, a portion of which had been previously owned and occupied by the defendant. The plaintiff claimed that the defendant was liable for costs incurred in respect to that portion of the site. The jury awarded the plaintiff 30% of its response costs for the entire site. We interpreted this result to mean that the defendant had been found wholly responsible for the contamination on the portion of the site it had previously owned, and that the award of 30% of the response costs for the entire site was based upon that finding. The case thus involved the apportionment of liability solely for the portion of the site previously

have offered a more detailed justification for awarding attorney's fees and costs related to claims and parties that were dismissed prior to trial, according to the factors we have previously suggested. See *Fontaine* v. *Ebtec Corp.*, 415 Mass. 309, 324-326 (1993); *Linthicum* v. *Archambault*, 379 Mass. 381, 388-389 (1979). Consistent with our conclusion that an action for contribution under G. L. c. 21E, § 4, imposes several liability only, an award of attorney's fees and costs incurred in bringing such an action should also impose several liability.

owned by the defendant; the record before us did not indicate whether the plaintiff or some other party was causally responsible for the contamination of the rest of the property. *Id.* at 628-629.

Our holding in *Sanitoy* therefore presumed that, although the plaintiff was liable under § 5 because of its status as the current owner, it was not equitably responsible for contaminating the land previously owned by the defendant. That we saw the plaintiff as an "innocent" party is evident from the cases cited in support of our position that the plaintiff should be eligible to recover attorney's fees and costs under § 15. In stating that "any person who undertakes [response actions] and subsequently seeks reimbursement pursuant to G. L. c. 21E, § 4, enforces and advances the purposes of [c. 21E]," *id.* at 632, we specifically equated this conclusion with that in *Sheehy* v. *Lipton Indus.*, *supra* at 197. The plaintiff in *Sheehy* had brought a § 4 claim against the prior owner of contaminated land; the plaintiff had not caused any of the contamination. *Id.* at 190-191, 197. Thus, we saw the plaintiffs in both *Sanitoy* and *Sheehy* as liable solely by reason of their ownership status. They both "advance[d] the purposes" of G. L. c. 21E by undertaking a cleanup and thereafter seeking, by means of a § 4 claim, to place the cost on the parties actually responsible for the problem.

There was a practical, policy-based reason as well for our conclusion in *Sanitoy*. If we denied attorney's fees and costs to a plaintiff that had not contributed to the release, the party or parties actually responsible might escape liability whenever the plaintiff faced litigation costs that could exceed the value of its recovery under § 4. *Sanitoy*, *supra* at 632-633. As support for this proposition, we cited *General Elec. Co.* v. *Litton Indus. Automation Sys., Inc.*, 920 F.2d 1415, 1422 (8th Cir. 1990), cert. denied, 499 U.S. 937 (1991). *Sanitoy* and *Sheehy* involved a suit by a nonpolluting land purchaser against a prior owner who had actually caused the pollution.[41]

In the present case, the jury found that the plaintiffs had

---

[41]A similar situation existed in *Oliveira* v. *Pereira*, 414 Mass. 66 (1992). In a ruling reached before *Sanitoy, Inc.* v. *Ilco Unican Corp.*, 413 Mass. 627 (1992), had been decided, the trial judge had found that the plaintiff (current landowner) had neither contributed to nor caused the contamination, but the judge had refused to award attorneys' fees under G. L. c. 21E, § 15. Citing *Sanitoy*, *supra* at 631, we remanded for reconsideration. *Oliveira*, *supra* at 68, 72.

contributed to the problem, and assigned to them a share of the responsibility nearly equal to that of each of the defendants. We do not believe that such a plaintiff "advances the purposes" of G. L. c. 21E by bringing an action for contribution; rather, the party is merely "seeking to apportion liability for an injury to which it contributed." *Akzo Coatings, Inc.* v. *Aigner Corp.*, 30 F.3d 761, 765 (7th Cir. 1994). As the judge in this case noted, "[T]here is little to distinguish between a tenant who actively employs hazardous materials and a landlord who supplies methods of disposal which are not suitable." Only a party which has not contributed to, or caused, the release of hazardous materials necessitating its response actions can "advance[ ] the purposes" of G. L. c. 21E by bringing a § 4 claim, and therefore only such a party may be awarded attorney's fees and costs under § 15.[42]

There are two additional reasons for limiting our holding in *Sanitoy* to the case of an "innocent" party. First, allowing partially responsible parties to seek attorney's fees and costs under G. L. c. 21E would provide a remedy that is unavailable under CERCLA and create an incentive for "forum shopping." This problem was not evident when *Sanitoy* was decided. At that time, Federal courts were split as to whether attorney's fees and costs were recoverable as "necessary costs of response" under CERCLA, 42 U.S.C. § 9607(a)(4)(B). See *Sanitoy, supra* at 630 n.5. In *Sanitoy*, we cited a Federal decision approving the award of attorney's fees and costs as CERCLA response costs, *General Elec. Co., supra* at 1421-1422, in support of our position that such an award served to support the policies of c. 21E. *Sanitoy, supra* at 632-633. However, the United States Supreme Court has subsequently decided that attorney's fees and costs are not recoverable in a private cost-recovery action under CERCLA. *Key Tronic Corp.* v. *United States*, 511 U.S. 809, 818-819 (1994). CERCLA and G. L. c. 21E are parallel, but not identical, statutes, and there are instances in which differences in statutory language result in differing applications of similar provisions.

---

[42]This general conclusion should not be taken to mean that the plaintiffs in this case could never be eligible for attorney's fees and costs. It is conceivable, after all, that in a new trial the jury will find that the plaintiffs were not at all responsible for the hazardous waste release and are entitled to recover all of their response costs, in which case the plaintiffs may also be awarded attorney's fees and costs.

See *Griffith* v. *New England Tel. & Tel. Co.*, 414 Mass. 824, 827-828 & n.5 (1993); *Acme Laundry Co.* v. *Secretary of Envtl. Affairs*, 410 Mass. 760, 770-771 (1991). Such is the case with G. L. c. 21E, § 15, and thus complete consistency on the subject of attorney's fees and costs is not possible. Our decision here at least limits, though it does not eliminate, the problem of conflicting rules for the two statutes.[43]

The second additional reason for allowing only "innocent" parties to recover attorney's fees and costs in a § 4 contribution action is to avoid inconsistency with G. L. c. 21E, § 4A, which was inserted by St. 1992, c. 133, § 294. Section 4A establishes procedures by which a liable person who has undertaken, or intends to undertake, a response action may notify another liable person and seek "contribution, reimbursement or equitable share" from that person, even before costs are incurred. The section further provides a timetable for a response from the notified party, and for negotiations (and, optionally, alternative dispute resolution procedures) between them. G. L. c. 21E, § 4A (*a*), (*b*). Only after such notice and procedures may a civil action be brought. G. L. c. 21E, § 4A (*c*). In such an action, the court may award attorney's fees and costs to the plaintiff, if the defendant is found to be liable, and the defendant:

---

[43]Like G. L. c. 21E, CERCLA authorizes citizen suits, but there are significant differences between the two statutes. The CERCLA provision allows any person to bring a civil action against anyone (including a government agency) "alleged to be in violation of any standard, regulation, condition, requirement, or order," and to seek relief through a court enforcement order or the imposition of civil penalties provided for the violation. Costs of litigation may be awarded to the prevailing party. 42 U.S.C. § 9659(a), (c), (f). Money damages are not among the specified remedies. By comparison, G. L. c. 21E, § 15, applies more broadly to "any suit" to "enforce the requirements" of c. 21E or "to abate a hazard related to oil or hazardous materials." Therefore, the plaintiffs in the present case seek attorney's fees and costs under § 15 in connection with a monetary claim under § 4, but under CERCLA, they could only seek attorney's fees and costs for pursuing a wholly different type of relief. See *AM Int'l, Inc.* v. *Datacard Corp.*, 106 F.3d 1342, 1348-1349 (7th Cir. 1997) (nonpolluting landowner cannot receive attorney's fees in cost recovery action, but may bring citizen suit under § 9659 for injunctive relief and attorney's fees); *Regan* v. *Cherry Corp.*, 706 F. Supp. 145, 148-150 (D.R.I. 1989) (CERCLA "citizen suit" provision does not provide private right of action for reimbursement of cleanup costs).

"(1) failed without reasonable basis to make a timely response to a notification pursuant to this section, or

"(2) did not participate in negotiations or dispute resolution in good faith, or

"(3) failed without reasonable basis to enter into or carry out an agreement to perform or participate in the performance of the response action on an equitable basis or pay its equitable share of the costs of such response action or of other liability pursuant to the provisions of this chapter, where its *liability was reasonably clear*" (emphasis added).

G. L. c. 21E, § 4A (*d*).[44] If § 15 were construed to allow attorney's fees and costs to be awarded to a plaintiff that has been held partially responsible, there would be a potential conflict between § 4A (*d*) and § 15: a defendant could be assessed attorney's fees and costs under § 15, even where a finding of shared responsibility between the plaintiff and the defendant would suggest that the defendant's liability had not been "reasonably clear." Cf. G. L. c. 176D, § 3 (9) (*f*) (unfair practice by insurer includes failure "to effectuate prompt, fair and equitable settlements of claims in which liability has become reasonably clear"); *Van Dyke* v. *St. Paul Fire & Marine Ins. Co.*, 388 Mass. 671, 677 (1983) (insurer's liability had not been "reasonably clear" where independent advice from counsel suggested reasonable prospect of success at trial).[45]

For all of these reasons, we construe § 15 as allowing an award of attorney's fees and costs only to persons who have

---

[44]A defendant's "inability to pay or undue financial hardship" is a reasonable basis for failing to pay or participate, provided that the defendant so notifies the plaintiff after receiving notice of the claim of liability. G. L. c. 21E, § 4A (*g*).

[45]Another anomaly could possibly result from G. L. c. 21E, § 4A (*f*), which allows an award of attorney's fees and costs to the *defendant* in certain circumstances, including where the plaintiff had taken an unreasonable position on the amount of the defendant's liability. Suppose that a plaintiff seeks an unreasonable amount of contribution, and receives a lesser amount at trial. Under § 4A (*f*), the defendant is entitled to its attorney's fees and costs; but so would be the plaintiff, if § 15 is construed to allow such an award to a plaintiff who recovers any amount, regardless of its own degree of responsibility for the release.

not themselves contributed to the hazardous waste release. Only such a party truly "advances the purposes" of G. L. c. 21E by bringing suit.

The judgment and the jury's verdict are vacated. The case is remanded to Superior Court for a new trial.

*So ordered.*