ATTORNEY GENERAL & another[1] *vs.* M.C.K., INC., & others.[2]

Suffolk. September 7, 2000. - October 13, 2000.

Present: MARSHALL, C.J., ABRAMS, GREANEY, IRELAND, SPINA, COWIN, & SOSMAN, JJ.

*Patient Protector Receivership Act. Nursing Home. Receiver. Corporation,* Corporate disregard. *Words,* "Facility."

Discussion of G. L. c. 111, §§ 72M-72R, the Patient Protector Receivership Act. [550-552]

This court concluded that the term "facility" as used in G. L. c. 111, § 72R, may, in appropriate circumstances, encompass the real estate on which a nursing home is located, as well as the buildings and personal property used in the operation of the home. [552-555]

A judge of the Superior Court properly disregarded corporate entities controlled by one person that separately held real estate, personal property, and a nursing home license, and correctly, pursuant to G. L. c. 111, § 72R, ordered the sale of all the corporate assets, where, in a situation in which the nursing home residents were endangered, there was a clear showing that the application of the Patient Protector Receivership Act would otherwise be frustrated. [555-558]

A receiver's power to sell assets of a nursing home licensee under G. L. c. 111, § 72R, was not terminated by the temporary closure of the facility after all the residents had transferred to other facilities. [558-561]

An action brought by the Attorney General under G. L. c. 111, § 72R, to place a nursing home in receivership under court supervision was remanded for further proceedings in which the facility would be subject to sale or closure. [561-562]

CIVIL ACTION commenced in the Superior Court Department on July 8, 1997.

After the appointment of a receiver, the case was heard by *Diane M. Kottmyer,* J., and the matter of the propriety of an order of sale was reported to the Appeals Court by her. The Supreme Judicial Court granted a request for direct review.

*Alvin S. Nathanson* for the defendants.

*Marianne Meacham,* Assistant Attorney General, for the plaintiffs.

---

[1]Department of Public Health.

[2]Reifer, Inc.; Nicha, Inc.; Parnasah, Inc.; Likra, Inc.; Mick D., Inc.; and Michael Konig.

GREANEY, J. This case concerns the authority of a receiver appointed by the Superior Court under G. L. c. 111, § 72R (the so-called Patient Protector Receivership Act [Act]), to sell a nursing home which has been placed under court supervision, because financial responsibility for the home was disclaimed by the owner, and the home's residents were endangered. A judge in the Superior Court entered an order directing that the home be sold and reported the propriety of her order. Another judge in the Superior Court entered a subsequent order that the home be closed. We granted the plaintiffs' application for direct appellate review because this is the first case that requires an interpretation of a receiver's authority to deal with a facility under the provisions of the Act. We conclude that the order directing sale was proper, but that there must be further proceedings to decide whether the home should be sold or closed.

1. The following background provides an understanding of the issues in the case. In 1993, the defendant Michael Konig (Konig) purchased five nursing homes in Massachusetts. In each instance, Konig established a corporation to hold title to the real estate on which each home was located, and he created a separate corporation which applied for, and held, the license to operate each home. The Union Square Nursing Center (Union Square), a 150-bed long-term care facility in the Brighton-Allston section of Boston, was one of these nursing homes. In the case of Union Square, Konig established Reifer, Inc. (Reifer), to hold title to the real estate and tangible assets used in the operation of the home, and M.C.K., Inc. (MCK), to apply for, and to hold, the home's license. Konig was the sole shareholder of both MCK and Reifer.

In 1995, the Department of Public Health (department) conducted its annual inspection survey of Valley View Nursing Home (Valley View) in Lenox, one of the five nursing homes purchased by Konig.[3] The survey disclosed conditions constituting an immediate and serious threat to the health and safety of the residents, resulting in a finding by the department of "jeopardy."[4] When jeopardy conditions had not been corrected

---

[3]The Department of Public Health (department) is the State agency responsible for licensing and certification of nursing homes. See G. L. c. 111, § 71. The department also monitors the quality of patient care in nursing homes, and department representatives may inspect a nursing home at any time to ensure compliance with State and Federal laws. See G. L. c. 111, § 72.

[4]Department regulations define "jeopardy" as "[a] situation or condition

by the time of the department's follow-up survey, the department terminated Valley View's certification. Shortly thereafter, the department found jeopardy in another Konig-controlled home, the Crescent Hill Nursing Center in Springfield. The fact that jeopardy had been found at two Konig-controlled homes within a two-month period raised immediate concerns about the health and safety of residents at each of the five Konig-controlled homes. As a result, the department informed Konig that it might commence proceedings to revoke his licenses to operate the five nursing homes.[5]

The department, and the defendants involved here, entered into a settlement agreement. In the agreement, MCK and Reifer agreed, that, as to Union Square, unless both had executed a purchase and sale agreement with a prospective buyer that had submitted a notice of intent to acquire a license for Union Square, MCK would submit to the department a notice of intent to close Union Square. MCK and Reifer also agreed to continue to retain a management company, which had been acting as temporary manager of each of the five nursing homes, until Union Square was either sold or closed. In exchange, the department agreed not to take further regulatory action against Konig, or his nursing homes, based on the prior documented violations. Konig signed the agreement in his capacity as president of all the multiple corporations involved in ownership of the nursing homes, including MCK and Reifer.[6]

After passage of considerable time, Konig had neither closed nor sold Union Square. In a letter to the department dated June 12, 1997, and signed by Konig as president, MCK "disclaim[ed] responsibility and or liability with respect to . . . closure and any operations of this facility [Union Square]." By this com-

---

which the Comissioner or his/her designee has determined presents an imminent threat to the health or safety of residents." 105 Code Mass. Regs. § 153.004 (1994).

[5]Because jeopardy had been found at two of the nursing homes controlled by Konig, adequate grounds existed for the department to deem him, and each of the Konig-owned corporate entities holding licenses to operate facilities in the Commonwealth, unsuitable to establish and maintain a long-term facility, and to revoke the licenses of all of the nursing homes. See 105 Code Mass. Regs. §§ 153.014, 153.012(A)(2), (6), (7) (1994).

[6]Konig also signed in his individual capacity for the limited purpose of agreeing to a portion of the facts set forth in the agreement, and for the additional purpose of agreeing not to operate any nursing homes in the Commonwealth for a period of ten years from the date of execution of the agreement.

munication, MCK and Konig sought to abandon Union Square. Their conduct placed Union Square residents in imminent danger of death or serious physical harm.

The department and the Attorney General (Commonwealth) promptly filed a complaint in the Superior Court against MCK, Reifer, and Konig, seeking the appointment of a receiver under the provisions of G. L. c. 111, § 72M, and seeking injunctive relief and civil penalties under the provisions of G. L. c. 93A, §§ 2 and 4.[7] A judge of the Superior Court appointed a temporary receiver of "M.C.K., Inc. d/b/a Union Square (referred to as 'The Facility')." The judge also ordered that, under G. L. c. 111, § 72Q, a lien for the costs of the receivership be imposed on the property on which Union Square is located.

On March 18, 1999, the Commonwealth moved, under G. L. c. 111, § 72R, to terminate the receivership of Union Square by a court-ordered sale of the nursing home, including its equipment, and the building and the real estate upon which the nursing home is located. A judge in the Superior Court determined that, while G. L. c. 111, § 72R, clearly authorized a sale under court supervision of Union Square, the Act did not authorize a court-ordered sale of the separately owned real estate upon which the nursing home is located. The judge observed, however, that the language of § 72M might, in appropriate circumstances, justify disregard of a separate corporate entity, and so concluded that a lawful order to sell the real estate of Union Square, which is owned by Reifer, would require that the court first "pierce the corporate veil of Reifer, Inc." The judge denied the Commonwealth's motion to sell without prejudice; severed the receivership action from the Commonwealth's separate claims under G. L. c. 93A; and ordered an expedited trial for a factual determination whether circumstances warranted treatment in law of MCK and Reifer as essentially one and the same.[8]

After that trial, the judge, based on her finding and ruling that, "MCK and Reifer are in fact the alter egos of Konig and disregard of their separate corporate forms is warranted,"

---

[7]The Commonwealth subsequently amended its complaint to include G. L. c. 93A claims against four other Konig-owned corporations arising out of Konig's operation of those nursing homes in Massachusetts.

[8]Thus, on this appeal, we are solely concerned with issues pertaining to the receivership and not with issues concerning the G. L. c. 93A claims.

ordered the sale of Union Square. The judge then reported the propriety of her order.[9] We granted direct appellate review. Thereafter, the receiver of Union Square filed an unopposed motion for authority to close the nursing home.[10] After a hearing, another judge in the Superior Court allowed the motion.[11]

2. We next summarize the relevant features of the Act. The Act authorizes the Superior Court, on a complaint by the Attorney General, the department, or other interested parties, to "appoint a receiver for any institution subject to licensing under section seventy-one, hereinafter called a facility,"[12] when the court finds that an emergency exists[13]; when the facility is operating without a license; or in situations when the licensing status of the institution is otherwise uncertain, and the lives, health, safety, or welfare of the residents cannot be adequately assured pending the court's decision. G. L. c. 111, § 72M. The purpose of a receivership under the Act is to "safeguard the health, safety and continuity of care to residents and to protect them from the adverse health effects and increased risk of death caused by abrupt or unsuitable transfer." G. L. c. 111, § 72N.

A receiver, with court approval, is authorized to "remedy

---

[9]The report is proper because a trial judge may report the propriety of an order of the sort in issue under Mass. R. Civ. P. 64, as amended, 423 Mass. 1410 (1996). The pendency of the G. L. c. 93A claim for trial does not invalidate the report in our view because of the significance of the issues involved.

[10]As the reason for his motion to close the nursing home, the receiver cited the department's finding, in October of 1999, that physical plant problems at Union Square posed a danger to the health and safety of the residents, the statements of deficiencies issued by the department, the cost of correcting the problems, and the lack of sufficient funds to do so. The receiver also pointed to a decline in the resident population (due to the long period of uncertainty surrounding the future of the nursing home); the inability to retain staff (also due, in part, to the uncertain future of the nursing home); the deferral of significant long-term maintenance; and mounting expenses of the receivership.

[11]The defendants Konig, MCK, and Reifer subsequently filed a motion to vacate the judge's order for the sale of Union Square. This motion was denied, but, although notice was sent to counsel, the denial was not entered on the docket of the Superior Court.

[12]Institutions subject to licensing under § 71 include a "convalescent or nursing home." G. L. c. 111, § 71.

[13]An "emergency" means a "situation or condition which presents imminent danger of death or serious physical harm to patients, including but not limited to imminent or actual abandonment of an occupied facility." G. L. c. 111, § 72M.

violations of federal and state law and regulations governing the operation of the facility; to hire, direct, manage and discharge any consultant or employees, including the administrator of the facility; to receive and expend in a reasonable and prudent manner the revenues of the facility; to continue the business of the facility and the care of the residents; to perform those acts necessary or desirable to accomplish the purpose of the receivership; to perform regular accountings and make periodic reports to the court; and to exercise such additional powers and perform such additional duties, as the court may deem appropriate." G. L. c. 111, § 72O. The Act contemplates that the receiver may also make major repairs to the real or personal property of the facility, to the extent necessary to prevent or remove jeopardy to the health, safety, or welfare of the residents, or to minimally qualify the facility for continuing participation in Medicare or Medicaid programs.[14] *Id.* The purpose of this provision is to "protect residents and to prevent the closure of facilities which, given proper management, are likely to be viable operations." *Id.*

The Act further provides that the Commonwealth shall have a lien for any expenditure under the above provisions, on the building or the land upon which the facility is located, or on any fixtures, equipment, or goods used in the operation of the facility. G. L. c. 111, § 72Q. As an additional remedy for recovering Commonwealth expenditures, the licensee, persons responsible for the affairs of the licensee, or the owner "may be held liable for such expenditures to the extent that any of these persons benefits financially from the expenditure." *Id.* Recovery of expenses incurred by the Commonwealth is also available against any person who, prior to the appointment of the receiver, violated a legal responsibility to assure appropriate maintenance of the facility, if any such violation necessitated the expenditure by the Commonwealth, and against any person who was responsible for the abandonment of the facility. *Id.*

Finally, the Act sets forth conditions whereby the court may terminate a receivership, and provides that, if the receivership has not been terminated within twelve months of the appointment of the receiver, the court shall order "either that the facility shall be closed, after an orderly transfer of the residents to

---

[14]If a receiver does not have sufficient capital for these repairs, the receiver may request that the court permit an application to the department for a loan. G. L. c. 111, § 72O.

appropriate alternative placements; or the facility shall be sold, under reasonable terms approved by the court, to a new owner approved for licensure by the department." G. L. c. 111, § 72R. The Act also provides that the receivership period may be extended as necessary to protect the health and safety of the residents. *Id.*

3. We turn now to the decision of the issues on appeal.

(a) This case essentially concerns the propriety of the judge's order to sell Union Square, including the real estate on which the home is located. The defendants claim that events subsequent to the entry of this order, namely, an order allowing the home to be closed; the transfer of all of the home's residents to other placements; and the closing of the home, render the appeal moot. We disagree.

The receivership is still in effect, and, for reasons that we shall discuss shortly, whether Union Square remains viable as a long-term care facility, or whether its continued operation is still desirable to protect its residents, is a matter that the Superior Court should decide. Further, the overriding purpose of the Act is to safeguard the health, safety, and continuity of care of nursing home residents, and to protect them from adverse effects caused by transfer necessitated by the closing of a nursing home. Because it is clear that the closing of Union Square was due, in substantial part, to financial difficulties inherent in keeping the home open pending appeal of the receiver's authority to sell, we conclude that the appeal presents important issues that are clearly "capable of repetition, yet evading review," and that ought to be resolved. *Karchmar* v. *Worcester*, 364 Mass. 124, 136 (1973), quoting *Southern Pac. Terminal Co.* v. *ICC*, 219 U.S. 498, 515 (1911).

(b) General Laws c. 111, § 72R, authorizes a court to order the sale of a "facility." The defendants maintain that the term "facility" refers solely to the entity that holds the license to operate a nursing home. Thus, while acknowledging that the court has the authority to order the sale of property owned by MCK, as the licensee, the defendants question the court's authority to order the sale of property owned by Reifer, a separate corporation. The Commonwealth, on the other hand, maintains that the term "facility" encompasses not only the licensed entity but also the real estate on which it is located, irrespective of the identity of the landowner. Neither argument is quite correct. We conclude that the term "facility," as used in

G. L. c. 111, § 72R, may, in appropriate circumstances, encompass the real estate on which the nursing home is located.

The precise statutory meaning of the term "facility" is elusive. A "facility" is defined in the Act as "any institution subject to licensing under section seventy-one." G. L. c. 111, § 72M. Section 71 provides for the licensing of nursing homes, and defines a "nursing home," for purposes of § 72, as "any institution, however named, whether conducted for charity or profit, which is advertised, announced or maintained for the express or implied purpose of caring for four or more persons admitted thereto for the purpose of nursing or convalescent care." Department licensing regulations, in turn, define an "institution" as "an establishment housed in a single building or in two or more adjacent buildings"; define a "facility" as a long-term care facility; define a "long-term care facility" as an institution; and list nursing homes as long-term care facilities. 105 Code Mass. Regs. § 150.001 (1994). The only certainty offered by the circuitous language set forth above is that the terms "facility," "institution," "long-term care facility," and "nursing home" are, for our purposes, synonymous.

Common sense dictates that the authority to sell a "facility" cannot include, in every case, the authority to sell the building in which the home is housed, the land on which the home is located, and the personal property used in the operation of the home, regardless of its ownership.[15] The Act clearly contemplates that the owners of real property on which the home is located may not be the same as the licensee. See, e.g., G. L. c. 111, § 72O (requiring notice to owner of real estate, as well as to licensee, should receiver petition court for permission to apply for loan for capital repairs); § 72P (setting forth procedures whereby receiver may apply to court to set reasonable rental for certain leases when real or personal property subject to lease is necessary to continued operation of facility).[16] Noticeably absent from the Act is any requirement of notice to

---

[15] A third-party landowner would never agree to lease property to a licensee, for the purposes of operating a nursing home, if such an agreement involved the risk of losing the property through a court-ordered sale, because of circumstances beyond his or her control.

[16] The department's requirement of separate reports to be filed by the licensee of a facility (RSC-1) and the real property owner (RSC-2) shows its expectation that ownership of a facility, such as a nursing home, may be held separately from the ownership of the real property on which the facility is located.

the owners of real estate and a hearing before the court orders the sale of a facility. We think this absence is some indication that the Legislature did not intend generally to authorize a court to sell the property of a third-party landowner. Furthermore, such a sale could present constitutional difficulties that the Legislature may not have contemplated or intended.[17]

While we recognize that the entity that holds the license is not required to be the owner of the real and personal property used in the operation of the home, the licensed entity must have a department-approved substantial ownership interest (a long-term lease, for example) in the property. The department requires that "[a]n applicant [for a license] or licensee must be the owner of the premises on which the facility is operated, or at least have such rights of ownership as the Commissioner or his/her designee finds necessary for the operation of a long-term care facility." 105 Code Mass. Regs. § 153.008 (1994).[18] We conclude, as did the judge in her decision for sale of Union Square, that the scope of the court's authority to sell a "facility," pursuant to G. L. c. 111, § 72R, is essentially fact specific, and depends in each case on the particular ownership interests in the real and personal property possessed by the licensed entity.

When, as is the case here, the licensed corporate entity owns nothing but the license to operate the nursing home, the statutory authority to sell the "facility" may include the power to sell other property necessary to operate the facility. This is so because the license to operate a nursing home is terminated by the imposition of a receivership, rendering the former licensee a corporate shell. The power to sell a shell corporation, that has no ownership rights in the real and personal property used in

---

[17]A court-ordered sale of the property of a third-party landowner could, in some instances, constitute an improper "taking," in violation of the Fifth Amendment to the United States Constitution and art. 10 of the Declaration of Rights of the Massachusetts Constitution. As we shall explain, an order for sale does not implicate constitutional taking violations here.

[18]The defendants point to a circular letter, dated April 18, 1995, from the director of the division of health care quality, interpreting this requirement to mean that "an applicant or licensee may lease the real estate (i.e., land and buildings) from the real property owner, [but] *must own* the 'long-term care facility (LTCF) business'" (emphasis original). This interpretation does not change our understanding of the department's ownership requirement, that a licensee must have a definite ownership interest in the land and the buildings used in the operation of a nursing home.

the operation of the nursing home, would be meaningless. As the judge correctly concluded: "If Konig were able to place all real and tangible property used in the operation of Union Square beyond the power of sale granted by the Legislature by the simple expedient of creating separate corporations which have no real existence apart from him, the statutory objective served by the power of sale would be thwarted." The court would lack any ability to protect nursing home residents from the trauma of abrupt transfer, a situation that would frustrate the Legislature's purpose. In such a case, a court may consider whether application of the doctrine of corporate disregard is warranted. See *Packard Clothes Inc.* v. *Director of the Div. of Employment Sec.*, 318 Mass. 329, 335 (1945).

The doctrine of corporate disregard is an equitable tool that authorizes courts, in rare situations, to ignore corporate formalities, where such disregard is necessary to provide a meaningful remedy for injuries and to avoid injustice. See *My Bread Baking Co.* v. *Cumberland Farms, Inc.*, 353 Mass. 614, 620 (1968). In certain situations, the doctrine may also properly be used to carry out legislative intent and to avoid evasion of statutes. See *Packard Clothes Inc.* v. *Director of the Div. of Employment Sec.*, *supra.* See also C.A. Peairs, Jr., Business Corporations § 646, at 565 (2d ed. 1971) ("corporate entity will be disregarded when necessary to . . . consummate the objective of a statute or other overriding public policy which would be frustrated by observance of the entity").

The judge here properly disregarded the corporate entities. She thoroughly reviewed the evidence and evaluated each of the twelve factors to be considered when a court is faced with the issue of setting aside corporate formalities.[19] She made careful findings of facts,[20] and was well warranted in concluding

---

[19]The relevant factors are (1) common ownership; (2) pervasive control; (3) confused intermingling of business assets; (4) thin capitalization; (5) nonobservance of corporate formalities; (6) absence of corporate records; (7) no payment of dividends; (8) insolvency at the time of the litigated transaction; (9) siphoning away of corporation's funds by dominant shareholder; (10) nonfunctioning of officers and directors; (11) use of the corporation for transactions of the dominant shareholders; and (12) use of the corporation in promoting fraud. *Pepsi-Cola Metro. Bottling Co.* v. *Checkers, Inc.*, 754 F.2d 10, 14-16 (1st Cir. 1985) (categorizing criteria set forth in *My Bread Baking Co.* v. *Cumberland Farms, Inc.*, 353 Mass. 614 [1968]). *Evans* v. *Multicon Constr. Corp.*, 30 Mass. App. Ct. 728, 733 (1991).

[20]The judge's extensive findings included the following relevant facts. At

that the facts demonstrated pervasive control of MCK and Reifer by Konig; confused intermingling of activity and assets among MCK, Reifer, and other Konig-controlled corporations; the existence of a common enterprise; the siphoning of corporate assets for the benefit of Konig and Konig-controlled and Konig-related entities; thin capitalization[21]; failure to observe corporate

---

the time of the filing of the license application, Konig was the sole director, officer, and shareholder of MCK and Reifer. Both corporations were thinly capitalized. The address of MCK, Reifer, and each of the other eight corporations that was the named licensee or owned the real estate for the other four Konig-controlled homes was the same, which at all relevant times was also Konig's business address.

Konig executed several agreements on behalf of both MCK and Reifer, including the 1995 settlement agreement. MCK never paid dividends to its shareholders. Konig was the primary signatory on the bank account established for Union Square, determined which bills should be paid, and was the ultimate decision maker with regard to the operation of Union Square. MCK and Reifer did not have bank accounts in their names.

At some point after the receiver was appointed, Konig signed a lease between MCK and Reifer, on behalf of each entity. No written lease between MCK and Reifer existed prior to the receivership. Although the lease purported to be for a term of fifteen years and provided an annual rent of $200,000, Union Square actually paid rent in the amount of $283,876 in 1994. Konig has signed agreements relating to the potential sale of Union Square on behalf of both entities.

Konig hired a managing company, Long Term Care Consultants, Inc. (LTCC), to provide administrative services for his nursing homes. LTCC set up bank accounts for each of the Konig-controlled homes. Frequently, at the request of LTCC, Konig would authorize wire transfers from Konig's personal bank account to one of the homes' accounts. Konig described these transfers as "loans," although no loan documents were ever executed. On occasion, money was transferred from an account in the name of one of the Konig facilities to an account in the name of another.

Konig purported to "gift" all his stock in Reifer to the Moshe Isaac Foundation for no consideration. The trustees of the Moshe Isaac Foundation are Konig and his wife, and its address is Konig's home address. Although Konig described the foundation as a charitable nonprofit corporation, he was not able to identify any such charity, with the exception of a single donation to an orphanage in Israel.

In the prereceivership period, Union Square was being operated by ADS, Inc. The temporary administrator of Union Square, an employee of ADS, had never heard of Reifer, and never dealt with anyone from MCK.

[21]The defendants specifically challenge this finding, asserting that if MCK were, indeed, thinly capitalized, the Commonwealth never would have granted it a license to operate Union Square. This claim ignores clear evidence to the contrary, including Konig's testimony in his deposition that he made numerous cash transfers from his personal bank account to Union Square bank ac-

formalities; and substantial disregard of corporate identities. The judge properly concluded that there was a clear showing of frustration of the Act, and a showing of the likelihood of injury to the residents of Union Square, if the court was not able to enter appropriate orders against Reifer, as well as MCK, which "are in fact the *alter egos* of Konig."

We reject the defendants' argument that, because the Commonwealth and the department were aware that MCK and Reifer were separate entities, the facts do not present an element of deception or fraud on the defendants' part, which, they claim, is required before a court may disregard corporate formalities. The facts here present a situation where two corporations (MCK and Reifer) were formed to carry out the objectives and purposes of the person controlling them (Konig). No impropriety is attached, necessarily, to the use of the corporate form in this way. Nevertheless, when one of the corporations (Reifer) later seeks to disassociate itself from the other (MCK), in a way that leads to complete frustration of a statutory purpose, the court may be warranted in carefully scrutinizing the corporate form, regardless whether actual fraud has been shown. See *My Bread Baking Co.* v. *Cumberland Farms, Inc.*, *supra* at 618-619. "Where there is common control of a group of separate corporations engaged in a single enterprise, failure (a) to make clear which corporation is taking action in a particular situation and the nature and extent of that action, *or* (b) to observe with care the formal barriers between the corporations with a proper segregation of their separate businesses (see *Acton Plumbing & Heating Co.* v. *Jared Builders, Inc.*, 368 Mich. 626, 628-630 [1962]), records, and finances, may warrant some disregard of the separate entities in rare particular situations in order to prevent gross inequity" (emphasis added). *Id.* at 620.

It is true that the Commonwealth and the department knew that MCK and Reifer were, in theory, separate corporations. In several instances, however, the actions of the Commonwealth and the department demonstrate their reasonable assumption that, for practical purposes, MCK and Reifer were one and the same entity, and that both corporations were alter egos of Konig. First, the department granted a license to MCK to operate Union Square, in spite of the fact that MCK had no ownership interest in any of the real and personal property required for the home's

---

counts, in order to cover the nursing home's operating expenses, and to prevent its checks from "[b]ouncing."

operation. Second, the receiver never paid, and was never asked to pay, rent to Reifer during the two years of the receivership.[22] Third, from the beginning, settlement negotiations between the Commonwealth and the defendants included Reifer as an active participant in the operations of the nursing home.[23] It is apparent here that both the Commonwealth and the department relied on their knowledge, and reasonable expectations, that MCK and Reifer were both owned and controlled solely by Konig, and were, in practical terms, one and the same entity.[24]

We conclude that when, as here, the license, the real estate, and the personal property are held by entities that are treated as one, the court is authorized, pursuant to G. L. c. 111, § 72R, to order the sale of the real estate and tangible property used in the operation of a nursing home.[25]

(c) We also conclude that the receiver's power to sell was not

---

[22]A lease was requested by the receiver on his appointment in 1997, and not produced until 1999. The lease is undated, unwitnessed, and signed by Konig on behalf of Reifer and MCK. In spite of the fact that the lease provided for an annual rent of $200,000, records produced by MCK showed that, in 1994, Union Square had paid rent in the amount of $283,876. The judge properly drew the inference that the lease in evidence was prepared at or about the time it was produced. The defendants referred to a lease at oral argument, but such a lease is not in the record and not part of this appeal.

[23]Under the original settlement agreement, Reifer agreed to continue the management services of ADS Consulting, Inc., and also agreed to sell the real and personal property of Union Square to a suitable prospective buyer.

[24]We reject the defendants' claims that the doctrine of corporate disregard may not be applied to the facts of this case because the Commonwealth has asserted no monetary claims, or because the Commonwealth failed to assert this theory in the original complaint.

[25]The defendants challenge the constitutionality of a court-ordered sale under G. L. c. 111. § 72R, as applied to the property of Reifer, claiming that it would amount to an unconstitutional taking. This argument lacks merit.

"A [regulatory scheme] amounts to a 'taking' if it fails substantially to advance a legitimate State interest or deprives a landowner of economically viable use of the land." *Greenfield Country Estates Tenants Ass'n* v. *Deep,* 423 Mass. 81, 86 (1996). A sale of Reifer, MCK, and Konig's property under G. L. c. 111, § 72R, would substantially advance the Commonwealth's legitimate interest in protecting the health and safety of the residents of Union Square. The fact that the home's residents have been transferred, at least temporarily, does not eliminate the substantial State interest in their welfare, and in the welfare of future residents. Moreover, § 72R provides for just compensation by authorizing the sale under "reasonable terms approved by the court." While a sale under § 72 may produce a purchase price below what might be negotiated on the open market, such an argument is purely speculative at this point. Further, Reifer, MCK, and Konig entered into the operation

terminated by the transfer of the residents of Union Square to other facilities. Section 72R authorizes a judge overseeing a receivership to "order either that the facility shall be closed, after an orderly transfer of the residents to appropriate alternative placements; or [that] the facility shall be sold, under reasonable terms approved by the court, to a new owner approved for licensure by the department." We are of the view that the power to sell ends only when the judge concludes that the facility in issue should be *permanently* closed. The power to sell, therefore, remains extant when appropriate circumstances dictate that the facility be *temporarily* closed, but the opportunity exists to reopen it under new ownership. Our view necessarily supports what appears to be a clear legislative intent to provide residents of facilities with safe and humane care at a time when there might be a shortage of adequate facilities to do so.

A few examples will illustrate the point.

(i) Suppose the receiver determines that the facility in receivership needs major capital improvements in order to satisfy legal requirements and ensure the health and safety of its residents. The improvements are such that they cannot be done with the residents remaining in the facility, and so, in order to do the improvements, the residents are transferred. The improvements are made and the facility is ready to reopen. Surely, no one could persuasively argue that the judge, on proper motion by the receiver, could not allow the facility to be sold to a new licensed owner so that the facility remains available for any former residents, who are able to return, or for new residents.

(ii) Suppose that the receiver determines that the residents of the facility need to be transferred for reasons other than those given in example (i). Suppose then that the judge orders the facility to be sold, but that efforts to sell are frustrated by the owner or operator of the facility (or both) pursuing an appeal, as they have a right to do. The normal delay in the appellate process dampens the receiver's efforts to sell, but the receiver believes and maintains, and the judge agrees, that the appeal having been decided in favor of the receiver, a renewed effort to sell should be made. Once again this presents a case of a

of Union Square with full knowledge of the regulatory scheme, including the provisions of § 72R. See *Steinbergh* v. *Cambridge*, 413 Mass. 736, 742 (1992), cert. denied, 508 U.S. 909 (1993). The fact that the defendants mistakenly assumed that the property held in Reifer's name could not be sold, under § 72R, is beside the point.

temporary closing with the power of sale remaining available within time limits and on conditions fashioned or approved by the judge.

This last example is somewhat the case here. Sale was authorized by a judge under § 72R, but the receiver, due to the delay in the appeal, and, perhaps, other circumstances, was unable to find a suitable buyer.[26] Now that the receiver has prevailed on this appeal, may he not seek to sell for a reasonable time if a judge approves? This is the position of the Commonwealth in this case. As it states in its brief: "Union Square's residents were transferred to other facilities in December of 1999. Efforts are being made to determine the health status of these residents, and whether a voluntary relocation to Union Square, assuming the facility is reopened, would be feasible or desirable. Whether Union Square is still viable as a long term care facility, or whether its continued operation is desirable to protect residents is a matter which the Superior Court may decide." This position on the part of the Commonwealth is not unreasonable.

As has been stated, the general purpose of the Act is to protect the residents of a long-term care facility from adverse health effects resulting from abrupt or unsuitable transfers. In her findings,[27] the judge recognized certain unique characteristics of the resident population of Union Square. The home's residents had a significantly higher incidence of psychiatric diagnoses, as well as a higher incidence of cognitive impairment, than the average nursing home residents in the Commonwealth. The home's residents also had a longer average length of stay than nursing home residents generally. In addition, the home's residents were statistically different from the average nursing home resident in their racial and ethnic diversity. While the population of most nursing homes is ninety-eight per cent white, the population of Union Square was sixty-seven per cent white. Union Square was one of only two nursing homes in the Boston area with a

---

[26]A receiver who is faced with delay caused by an appeal may seek to expedite the appeal and may pursue any other measures available to a receiver, in the position of an appellee, who is confronted with time constraints and an appellant who may be advancing clearly untenable positions in order to defeat the sale. We do not suggest that the defendants' arguments in this case fell into the latter category.

[27]The judge's findings were based, in part, on the testimony of a social worker from Union Square, as well as on the testimony of an expert in the field of gerontology.

substantial Chinese-speaking population. The home attracted residents from the Chinese population because language is the single most important factor in choosing a nursing home for Chinese-speaking families, and Union Square employed both nursing and social services staff that spoke, collectively, three Chinese dialects. The home also offered special dietary, cultural, and social activities for Chinese residents. Further, Union Square was an urban facility, accessible by public transportation, an essential need for many of the home's residents and their families. These characteristics made the home's residents particularly vulnerable to the effects of relocation.

The judge further found that, because of the unique characteristics of Union Square's resident population, suitable placement options did not exist for all residents. At the date of the hearing, there was no nursing facility in the relevant geographical area that had committed to taking the Chinese-speaking residents of Union Square as a group, or to taking Chinese-speaking staff. In addition, care of the high percentage of the home's residents who had psychiatric diagnoses or were cognitively impaired (or both) required skills that were not available in the average facility. The judge found that Union Square's residents were at an increased risk of illness and death from involuntary transfers that would result from the closing of Union Square.

The judge determined that Union Square was a viable nursing facility, and that the statutory scheme and purposes of the Act would best be effectuated by its sale. The question whether Union Square can, and should be, preserved as a viable facility is one that cannot be satisfactorily resolved on this record, but is one which should be explored further.[28]

4. The case is remanded to the Superior Court to reconsider the conflicting orders in effect regarding Union Square. In accordance with this opinion, the receiver and the Commonwealth may, if they chose, apply to a judge to vacate the order closing the facility, to vacate the order to sell the facility, or both. The judge may, at his or her discretion, enter a new order directing Union Square to be sold on appropriate terms and conditions,

---

[28]The language of the Act supports the continuation of a receiver's possession and control of a facility beyond an actual closure of the facility. Section 72O authorizes a receiver to "perform those acts necessary or desirable to accomplish the purpose of the receivership . . . and to exercise such additional powers and perform such additional duties, as the court may deem appropriate."

and within a time limit, as the judge may decide. If a sale is not allowed, or cannot be effectuated, then the judge should reenter the order closing the facility, pursuant to G. L. c. 111, § 72R, and take such further action as is necessary or appropriate to terminate the receivership and to allow the Commonwealth to recover its costs and expenses.

*So ordered.*