van Gestel, J.
This matter is before the Court on cross motions for summary judgment pursuant to Mass.R.Civ.P. Rule 56 and on two peripheral motions in connection therewith.
The summary judgment motions, in their order of docketing, are entitled: Plaintiffs Partial Motion for Summary Judgment (Paper #20); Defendant Boston Gas Company’s Motion for Summary Judgment (Paper #23); Defendant KeySpan New England, LLC’s Motion for Summary Judgment (Paper #24); and Defendant National Grid USA’s Motion for Summary Judgment on Corporate Successor Issues (Paper #26).
The two peripheral motions are: Plaintiffs Motion to File Motion for Summary Judgment Under Seal (Paper #21); and Plaintiffs Emergency Motion to Strike Defendants’ Summary Judgment Motions (Paper #22).
The underlying case involves environmental contamination matters, presenting claims predicated on G.L.c. 2IE, common-law trespass, nuisance, unjust enrichment, G.L.c. 93A and for declaratory relief under G.L.c. 231A.
Consistent with the suggestion of all parties, the Court segmented the discovery and resolution of the “corporate successor” issues as the first matter to be resolved. That discovery is now complete, and these motions present the complex corporate successor issues.
BACKGROUND
The plaintiff, Wayne Scott (“Scott”), a Massachusetts resident, is the Trustee of 12 Woodbury Court Trust (the ‘Trust”), said to be a Massachusetts business trust. The Trust is the current owner of certain *667 real property located at 12 Woodbury Court in Salem, Massachusetts (the “Property”), having purchased the Property in January 2002, for the purpose of developing and selling two townhouses thereon.
Shortly thereafter, in its initial performance of construction activities razing the previous dwelling, the Trust discovered the presence of certain potentially hazardous materials in soil at the Property. The contamination was analyzed to be “highly volatile” coal tar or other similar contaminated material.
For purposes of these motions only, it is assumed that the contamination migrated from an adjoining site and was created by the operations of a company called Salem Gas Light Company (“Salem Gas”). From 1850 to 1890, Salem Gas owned and operated a “gas works” located on Northey Street in Salem. The Northey Street gas works facility abutted Woodbury Court. Here, Salem Gas manufactured gas from coal, and the gas thus produced was distributed locally for lighting, heating and cooking purposes.
In 1890, gas production at the Northey Street site ended, and the properly was conveyed by Salem Gas to a third party.[2] Salem Gas remained in business, however, and began manufacturing gas at a new location, on Pierce Avenue in Salem. The Pierce Avenue site is not said to have been the source of any contamination of the Trust’s property on Woodbury Court.
It is the attempt by Scott and the Trust to trace the corporate successorship of Salem Gas to the present and thereby assign liability under G.L.c. 2IE for the century-old contamination on Woodbury Court that results in the present motions.
Salem Gas continued to manufacture gas at its Pierce Avenue site until 1953. In 1926, however, North Boston Lighting Properties (“NBLP”), a business trust organized in 1911, began acquiring the stock of Salem Gas, and Salem Gas ultimately became a subsidiary of NBLP.
NBLP was itself a second-tier subsidiary of New England Power Association (“NEPA”), a business trust created in 1926. Pursuant to a reorganization of NEPA that was consummated in 1947, New England Electric System (“NEES”) was formed, and NBLP’s assets were transferred to NEES. Consequently, Salem Gas thereby became a subsidiary of NEES in 1947.
In 1951, NEES formed an unincorporated “Gas Division.” Then in 1953, NEES arranged for the consolidation of the gas operations of Salem Gas, Gloucester Gas Light Company and Beverly Gas and Electric Company into a newly organized North Shore Gas Company (“North Shore Gas”).
After the consolidation, North Shore Gas operated the gas facility at Pierce Avenue in Salem, as well as gas facilities in Gloucester and Beverly.
In March 1964, the Securities and Exchange Commission (“SEC”) ordered NEES to divest itself of all of its gas subsidiaries, including North Shore Gas. In the early 1970s, after unsuccessfully appealing from the SEC Order, NEES divested itself of its gas subsidiaries. On October 27, 1972, NEES and Eastern Gas & Fuel Associates (“Eastern") executed a purchase and sale agreement for the sale by NEES to Eastern of all of the stock NEES owned in North Shore Gas, Lynn Gas Company (“Lynn Gas”) and Mystic Valley Gas Company (“Mystic Valley Gas”) (the “Stock Purchase Agreement”).
Under the terms of the Stock Purchase Agreement, Eastern agreed to pay NEES $26,881,351.75 for the subject shares, plus or minus any change in the book value of the stock up to the end of the month preceding the closing of the transaction. The Stock Purchase Agreement contemplated that North Shore Gas, Lynn Gas and Mystic Valley Gas would be acquired by or combined with Eastern’s subsidiary, Boston Gas Company (“Boston Gas”), formerly known as Boston Consolidated Gas Company. The stock purchase was conditioned on regulatory approval of such a combination.
On January 23, 1973, Boston Gas, North Shore Gas, Lynn Gas and Mystic Valley Gas executed an Agreement of Purchase and Sale of Assets and Assumption of Liabilities (the “Asset Purchase Agreement”). Under the Asset Purchase Agreement, Boston Gas agreed to purchase all of the assets of North Shore Gas, Lynn Gas and Mystic Valley Gas “as then constituted,” and to assume all of the liabilities of the three companies “as then existing.”
The Asset Purchase Agreement further provided that, following the sale, each of the sellers would distribute the cash it received among its shareholders in liquidation of all outstanding capital stock, thereby eliminating any publicly held minority interests, as required by the SEC.
On March 1, 1973, the Massachusetts Department of Public Utilities (the “DPU”) issued an order approving the Asset Purchase Agreement. Later in that year, on October 25, 1973, the SEC issued a Memorandum and Order approving the plan of NEES to sell its stock interests in North Shore Gas, Lynn Gas and Mystic Valley Gas to Eastern. On December 20, 1973, there were two closings. In the first, as provided in the Stock Purchase Agreement, NEES transferred its stock in North Shore Gas, Lynn Gas and Mystic Valley Gas to Eastern in exchange for the agreed purchase price, as adjusted.
At the time the foregoing transaction closed, NEES owned 97.83% of the capital stock of North Shore Gas, 93.77% of the capital stock of Lynn Gas; and 99.43% of the capital stock of Mystic Valley Gas.
In the second closing on December 20, 1973, as provided in the Asset Purchase Agreement, Boston Gas purchased the assets of North Shore Gas, Lynn Gas and Mystic Valley Gas. In connection with this purchase, Boston Gas confirmed its assumption of liabilities by delivering to each of the sellers, including North Shore Gas, an “Assumption for Liabilities.” The Assumption for Liabilities reiterated that Boston Gas *668 assumed all of the liabilities of North Shore Gas “outstanding at the date hereof.”
Thereafter, also in accordance with .the Asset Purchase Agreement, the stockholders of the sellers, including North Shore Gas, voted to accept the resignations of all NEES-affiliated officers and directors and to liquidate all outstanding stock for cash.
After Boston Gas’s purchase of the assets of North Shore Gas, all NEES-affiliated officers and directors of North Shore Gas resigned, and the management role of NEES’s Gas Division was removed and replaced with the existing management structure of Boston Gas.
A number of management-level employees of North Shore Gas accepted positions with Boston Gas, mostly assuming new and different responsibilities and reporting to top-level management at Boston Gas. At lower levels, Boston Gas retained many of the North Shore Gas employees in positions similar to those they held at North Shore Gas.
NG US 1, Inc., a/k/a National Grid USA (“National Grid”), aDelaware corporation, is the successor to NEES.
From January 1, 1972 to June 3, 2002, Boston Gas was a wholly owned subsidiary of Eastern. It is presently doing business as KeySpan Energy Delivery New England.
KeySpan New England, LLC is a Massachusetts limited liability corporation which is a wholly owned subsidiary of KeySpan Corporation. On June 3, 2002, Eastern was merged into KeySpan New England, LLC. As a result of this merger, Boston Gas became a wholly owned subsidiary of KeySpan New England.
DISCUSSION
Scott’s counsel reminds the Court that Salem Gas began its operations at Northey Street in the same year that Salem author Nathaniel Hawthorne produced The Scarlet Letter. The Court observes that a year later, in 1851, Hawthorne completed The House of the Seven Gables. In the preface to the latter Hawthorne wrote:
Not to be deficient in this particular, the author has provided himself with a moralthe truth, namely, that the wrongdoing of one generation lives into the successive ones.
Here, the Court is asked to determine whether an environmental wrongdoing that was committed 113 years ago by Salem Gas lives on as a burden visited upon successive corporate generations.
Summary judgment is granted where there are no issues of genuine material fact, and the moving party is entitled to judgment as a matter of law. Hakim v. Massachusetts Insurers’ Insolvency Fund, 424 Mass. 275, 281 (1997); Kourouvacilis v. General Motors Corp., 410 Mass. 706, 716 (1991); Cassesso v. Commissioner of Correction, 390 Mass. 419, 422 (1983); Mass.R.Civ.P. 56(c). The moving party bears the burden of affirmatively demonstrating that there is no triable issue of fact. Pederson v. Time, Inc., 404 Mass. 14, 17 (1989). Here, of course, all parties seek summary judgment, and they all agree that there are no material facts in dispute on the issues of corporate succession.
What these motions require of the Court is an analysis of the metamorphosis of Salem Gas under the glare of G.L.c. 2 IE’s, broad and sweeping effort to control environmental degradation and impose responsibility upon those at fault. How far from the facts of the event can the long arm of that statute reach? The Court begins with a review of the statute’s imposition of liability, after which it will apply its observations to the complex corporate history recited above.
Scott grounds his case against the several defendants by charging them as “persons liable pursuant to M.G.L.c. 21E, secs. 5(a)(1) and 5(a)(5) as the owner /operator and/or as a person who otherwise caused and continues to cause an oil and/or hazardous materials release on to the Property, which has resulted in the Trust incurring reasonable and necessary response costs pursuant to M.G.L.c. 2 IE and the Massachusetts Contingency Plan.” Complaint, para. 30.
The statutory references read as follows:
Section 5, (a) Except as otherwise provided in this section, (1) the owner or operator of a vessel or a site from or at which there is or has been a release or threat of release of oil or hazardous material;... and (5) any person who otherwise caused or is legally responsible for a release or threat of release of oil or hazardous material from a vessel or site, shall be liable without regard to fault,... (iii) to any person for damage to his real or personal property incurred or suffered as a result of such release or threat of release ...
Here the Court deals with a “site," not a “vessel.” The site in issue is the Northey Street gas works owned and operated by Salem Gas from 1850 to 1890. The site was sold by Salem Gas in 1890 to an unnamed third party. Thus, none of the three defendants named in this case was ever the owner or operator of the site or caused a release or threat of release of oil or hazardous material from the site. Nor did any of the defendants own any interest in Salem Gas at the time it operated the facility at the site.
The issue to be resolved is whether any of the named defendants are legally responsible for a release from the site through some form of corporate successor liability. This is because, as the agreed facts make clear, it was not until 192636 years after Salem Gas sold the sitethat North Boston lighting Properties first began to purchase stock in Salem Gas. It was not for another 76 years that Scott purchased the Property adjacent to the site, apparently without first doing an environmental study thereof.[3]
Scott presents two arguments for liability on the part of National Grid, the conceded successor to NEES. First, Scott charges NEES with “parental 2IE operator liability.” Second, he charges NEES with liability under the doctrine of “piercing the corporate veil.”
*669 Scott makes three arguments for liability on the part of Boston Gas. First, he claims that Boston Gas assumed the liability by operation of statute. Second, he argues that Boston Gas assumed liability under common law either as a result of “(i) a defacto merger or (ii) as a mere continuation of the enterprise then having the liability.” Third, he says Boston Gas “assumed the liability by agreement.”
The Court will address each of the five positions separately. In doing so, it will address the claims against National Grid by referring to its predecessor, NEES, because it was the most referred to in that corporate family and by referring to Boston Gas when dealing with the KeySpan entities.
Further, in assaying the law under G.L.c. 2 IE, the Court will take direction from the Supreme Judicial Court and often look to decisions of other courts applying the law under the Comprehensive Environmental Response, Compensation and Liability Act (“CERCLA”) found at 41 U.S.C. Secs. 9601 et seq. See Martignetti v. Haigh-Farr Inc., 425 Mass. 294, 301 n.12 (1997).
NEES LIABILITY
Parental G.L.c. 21E Operator Liability of NEES
Scott argues, correctly, that in the context of environmental contamination, courts have held parent corporations liable when the parent is considered to be an operator. He cites to United States v. Kayser-Roth Corp., 910 F.2d 24, 26 (1st Cir. 1990). Scott then points out thatNEES was the parental operator of North Shore Gas, citing among others the Federal Court’s decision in John Boyd Co., Inc. v. Boston Gas Co., 1992 U.S. Dist. LEXIS 13088, *20-23 (August 18, 1992), affirmed on this point at 992 F.2d 401, 408 (1st Cir. 1993).
A significant fact that Scott’s argument overlooks, however, is that under any assessment of the family tree, neither NEES nor its predecessor New England Power Association had any relationship of any kind with Salem Gas until NBLP, a New England Power Association subsidiary, began buying Salem Gas stock in 1926. Long before that time, in 1890 Salem Gas had sold the Northey Street facility and was no longer operating it.
Only present owners or operators of a site are directly liable under G.L.c. 21E, Sec. 5(a). Griffith v. New England Telephone and Telegraph Co., 414 Mass. 824, 827-29 (1993). “[W]hat is at issue, under G.L.c. 21E, is whether a party is the operator of a site (in CERCLA terms, a facility), not whether it is the operator of the subsidiary business.” Martignetti v. Haigh-Farr, Inc 425 Mass. 294, 304 n.20 (1997). “The question is not whether the parent operates the subsidiary, but rather whether it operates the faciliiy, and that operation is evidenced by participation in the activities of the facility, not the subsidiary... The analysis should rest[ ] on the relationship between the [parent] and the . . . facility itself.” United States v. Bestfoods, 524 U.S. 51, 68 (1998).
Here, NEES was not even the operator of Salem Gas, to say nothing of being the operator of the Northey Street facility, at any time that Salem Gas operated at Northey Street. Neither NEES, nor its present-day successor, NG US 1, Inc., can be found responsible to Scott on a theory of parental G.L.c. 21E operator liability.
Piercing the NEES Corporate Veil
Arguing on much the same facts as in his parental operator liability position, Scott next contends that the doctrine of piercing the corporate veil makes NEES directly liable for any liability of Salem Gas and North Shore Gas “because of its pervasive, omnipresent control of those companies as integrated aspects of the Gas Division.” Scott contends, “Put simply, these entities were never independent entities but mere paper creations.” Scott’s Memorandum at p.26.
A parent corporation may be derivatively liable under G.L.c. 21E for the release of hazardous materials from a faciliiy or site when “circumstances justify ‘piercing the corporate veil’ under traditional corporate law doctrines and treating the parent corporation, rather than the subsidiary, as the owner of the facility.” Haigh-Farr, supra, 425 Mass. at 301 n.16. See also Bestfoods, supra, 524 U.S. at 63-64 (“[W]hen (but only when) the corporate veil may be pierced, may a parent corporation be charged with derivative liability for its subsidiary’s action”).
Massachusetts law regarding the doctrine of corporate veil piercing is often cited for the articulation in My Bread Baking Co. v. Cumberland Farms, Inc., 353 Mass. 614 (1968), a case with which this Court is more than casually familiar.[4] The oft-quoted language from My Bread reads:
Although common ownership of the stock of two or more corporations together with common management, standing alone, will not give rise to liability on the part of one corporation for the acts of another corporation or its employees, additional facts may be such as to permit the conclusion that an agency or similar relationship exists between the entities. Particularly is this true (a) when there is active and direct participation by the representatives of one corporation, apparently exercising some form of pervasive control, in the activities of another and there is some fraudulent or injurious consequence of the intercor-porate relationship, or (b) when there is a confused intermingling of activity of two or more corporations engaged in a common enterprise with substantial disregard of the separate nature of the corporate entities, or serious ambiguity about the manner and capacity in which the various corporations and their respective representatives are acting. In such circumstances, in imposing liability upon one or more of a group of “closely identified" corporations, a court “need not consider with nicely which of them” ought to be held liable for the act of one corporation “for which the plaintiff deserves payment.”
Id. at 619.
A recent re-articulation of the My Bread veil-piercing test appears in Attorney General v. M.C.K., Inc., 432 *670 Mass. 546, 555-57 (2000), wherein the SJC observed that when one corporation seeks to disassociate itself from another “in a way that leads to a complete frustration of a statutory purpose, the court may be warranted in carefully scrutinizing the corporate form, regardless whether actual fraud has been shown.”
There has been no showing by Scott that there was any active, significant or direct participation or control by NEES, or its predecessor entity, in the affairs of Salem Gas with regard to the operation of the Northey Street facility. Proof of such significant control is necessary to establish jurisdiction over a parent company for its subsidiary’s activities. See Kleinerman v. Morse, 26 Mass.App.Ct. 819, 823 (1989) (citing My Bread, supra, 353 Mass. at 618-19); Cabot Safety Intermed. Corp. v. Akron Safety Equip., Inc., 12 F.Sup.2d 180, 181-82 (D.Mass. 1998).
Further, My Bread cautions that veil piercing is an extraordinary remedy that only should be applied “in rare particular circumstances in order to prevent gross inequity.” My Bread, supra, 353 Mass. at 620. Thus, in the absence of some very special facts, a parent corporation should not be held responsible by veil piercing for the acts of a subsidiary that occurred decades before the parent acquired the subsidiary. See, e.g., Dale v. H.B. Smith Co., Inc., 910 F.Sup. 14, 19 (D.Mass. 1995).
In both My Bread and M.C.K., Inc., the acts that caused the harm to the plaintiffs there occurred while the parent-subsidiary relationship was in place. Here, by significant contrast, the acts of Salem Gas were committed over three decades before the first share of its stock was acquiredand nothing has been put forward to even hint that the stock purchase was for any purpose relating to Salem Gas’s operations at Northey Street. Indeed, there is nothing in the record to demonstrate that when the stock was acquired, the purchaser knew anything at all about the Northey Street operations. Unlike the situation in John Boyd Co. v. Boston Gas Co., 775 F.Sup. 435 (D.Mass. 1991), where the Lynn Gas facility remained in operation after its acquisition, the Salem Gas Northey Street facility was sold and dismantled decades before the first share of stock was purchased.
There was no “gross inequity” warranting a veil-piercing exercise here.
BOSTON GAS LIABILITY
The first of Scott’s contentions regarding the Boston Gas entities involves his argument that Boston Gas succeeded to the liabilities of Salem Gas by the 1973 transaction, either as a matter of common law or by G.L.c. 164, Sec. 98. He cites to Guzman v. MRM/Elgin, 409 Mass. 563 (1991). In Guzmanthe Massachusetts law was articulated as follows:
Most jurisdictions, including Massachusetts, follow the traditional corporate law principle that the liabilities of a selling corporation are not imposed upon the successor corporation which purchases its assets, unless (1) the successor expressly or impliedly assumes liability of the predecessor, (2) the transaction is a de facto merger or consolidation, (3) the successor is a mere continuation of the predecessor, or (4) the transaction is a fraudulent effort to avoid liabilities . . .
Id. at 566. See also Dayton v. Peck, Stow & Wilcox Co., 739 F.2d 690, 692 (1st Cir. 1984).
Scott makes no argument, and alleges no facts, supporting the fourth exception recited in Guzman. He argues two positions for the first exception: (1) common-law successor liability and (2) statutory assumption of liability. He also contends that the 1973 transaction was a de facto merger under the second exception or a continuing enterprise under the third exception. The Court will address Scott’s positions in the order noted.
Common-law Successor Liability by Boston Gas
Scott argues that Boston Gas, in the somewhat complicated 1973 transaction, assumed all of the liabilities of North Shore Gas. This transaction was the outgrowth of the SEC order compelling the divestiture by NEES of all of its gas subsidiaries, including North Shore Gas. See Securities and Exchange Commission v. New England Electric System, 390 U.S. 207 (1968). As a result of the SEC order, NEES and Eastern Gas & Fuel Associates (the corporate parent of Boston Gas) executed the Stock Purchase Agreement for the sale by NEES to Eastern of all of the stock NEES owned in North Shore Gas, Lynn Gas and Mystic Valley Gas.
Under the terms of the Stock Purchase Agreement, Eastern agreed to pay NEES $26,881,351.75 for the subject shares, plus or minus any change in the book value of the stock up to the end of the month preceding the closing of the transaction. The Stock Purchase Agreement contemplated that North Shore Gas, Lynn Gas and Mystic Valley Gas would be acquired by or combined with Eastern’s subsidiary, Boston Gas. The stock purchase was conditioned on regulatory approval of such a combination.
On January 23, 1973, Boston Gas, North Shore Gas, Lynn Gas and Mystic Valley Gas executed the Asset Purchase Agreement whereby Boston Gas agreed to purchase all of the assets of North Shore Gas, Lynn Gas and Mystic Valley Gas “as then constituted,” and to assume all of the liabilities of the three companies “as then existing.”
The Asset Purchase Agreement further provided that, following the sale, each of the sellers would distribute the cash it received among its shareholders in liquidation of all outstanding capital stock, thereby eliminating any publicly held minoriiy interests, as required by the SEC.
Both the Massachusetts DPU and the SEC issued orders approving the plan of NEES to sell its stock interests in North Shore Gas, Lynn Gas and Mystic Valley Gas to Eastern. On December 20, 1973, there were two closings. In the first, as provided in the Stock Purchase Agreement, NEES transferred its 97.83% *671 interest in the stock of North Shore Gas, its 93.77% interest in the stock of Lynn Gas and its 99.43% interest in the stock of Mystic Valley Gas to Eastern in exchange for the agreed purchase price, as adjusted.
In the second closing on December 20, 1973, Boston Gas purchased the assets of North Shore Gas, Lynn Gas and Mystic Valley Gas. In connection with this purchase, Boston Gas confirmed its assumption of liabilities by delivering to each of the sellers, including North Shore Gas, its Assumption for Liabilities which reiterated that Boston Gas assumed all of the liabilities of North Shore Gas “outstanding at the date hereof.”
Thereafter, the stockholders of the sellers, including North Shore Gas, voted to accept the resignations of all NEES-affiliated officers and directors and to liquidate all outstanding stock for cash.
This is not the first time that this 1973 transaction between NEES and Eastern has been reviewed by a court. Ten years ago the First Circuit Court of Appeals issued a decision in John S. Boyd Co. v. Boston Gas Co., 992 F.2d 401 (1st Cir. 1993), in which it concluded that the phrase “as then existing” in the Asset Purchase Agreement and the phrase “outstanding at the date hereof’ in the Assumption for Liabilities foreclosed the possibility that Boston Gas assumed any contingent liabilities of Lynn Gas. Id. at 407. In reaching this conclusion, the First Circuit considered Massachusetts law to the effect that after-enacted statutes are not commonly considered to become part of a pre-enactment agreement, and the rule that general releases are given full effect if their language is broad enough to encompass contingent liability. Id. at 406.
G.L.c. 2IE, and CERCLA, its federal predecessor, were each enacted several years after the 1973 transaction closed.[5]
This Court is not bound by decisions of the federal courts. However, as noted above, the SJC has directed that Massachusetts trial judges look to decisions of the federal courts under CERCLA when reviewing matters under G.L.c. 21E. This Court has done so here and finds the assessment by the First Circuit in Boyd of the interplay between CERCLA and Massachusetts corporate law to be well reasoned and appropriate in this Court’s consideration of the 1973 transaction insofar as it relates to what liabilities Boston Gas was assuming when it acquired North Shore Gas. The contractual language makes clear, as Judge Torruella held in Boyd, supra, 992 F.2d at 407, that neither the Asset Purchase Agreement nor the Assumption for Liabilities document evidences the necessary intent to transfer the contingent environmental liability of North Shore Gas, whether under existing or future law, if any, to Boston Gas.
Statutory Assumption of Liability by Boston Gas
Scott further argues that Boston Gas assumed the liability of Salem Gas by virtue of G.L.c. 164, Sec. 98. That statute reads in essential part as follows:
The purchasing or consolidated company shall . . . have and enjoy all the powers, rights, locations, licenses, privileges and franchises, and be subject to all the duties, liabilities and restrictions, of the company selling or merging as aforesaid, so far as they are applicable to the purchasing or consolidated company.
By this statute a utility company that purchases assets from another utilily company takes the assets purchased subject to the liabilities of the selling company “so far as they are applicable to the purchasing . . . company.” Thus, Scott argues that all of North Shore Gas’s assets were completely transferred to Boston Gas, including the G.L.c. 2 IE liability to him. Any c. 2 IE liability of Salem Gas or its successor North Shore Gas, of course, did not come into being until the statute was enacted in 1983, ten years after the 1973 transaction in issue.
In Longview Fibre Company v. Boston Gas Company, C.A. #92-10284-WD, (D.Mass., September 10, 1993), Judge Woodlock presented a careful and extensive analysis of the predecessor statute[6] to what is now G.L.c. 164, Sec. 98. He concluded that the
chief effect of the statute is to allow parties to buy and sell utilities without the involvement of the legislature . . . [and that] the logical implication is that the ordinary rules governing private arrangementsthe common law of contracts and corporationswere intended to govern utility mergers and acquisitions. That law provided a background rule, viz, that asset purchasers did not buy liability, around which parties could contract.
Id. at 6.
Judge Woodlock, citing to John S. Boyd Co., supra, 992 F.2d at 409, concluded that a correct interpretation of the statutory predecessor to c. 164, Sec. 98par-ticularly the language “so far as they are applicable to the purchasing . . . company”results in a determination that “the law does not itself impose liability on a purchasing corporation.” Id, at 7.
This Court finds Judge Woodlock’s analysis convincing and correct. G.L.c. 164, Sec. 98 cannot be read, ipso facto, to transfer the contingent environmental liability of Salem Gas or North Shore Gas to Boston Gas as a result of the 1973 transaction.
The 1973 Transaction as a De Facto Merger or Continuation of the Enterprise
The third contention by Scott against Boston Gas is that the 1973 transaction was a defacto merger or a mere continuation of the enterprise then having the liability. These are the second and third exceptions to the traditional corporate lawprinciple that the liabilities of a selling corporation are not imposed upon the purchasing successor. See Guzman, supra, 409 Mass. at 563.
Judge Young, in In re Acushnet River & New Bedford Harbor Proceedings re Alleged PCB Pollution, 712 F.Sup. 1010 (D.Mass. 1989), observed that “the distinction between the two exceptions seems more apparent than real,” noting that “the de facto merger *672 exception subsumes the continuation exception.” Id. at 1019. Both the continuation doctrine and the de facto merger approach require a continuity of the successor and predecessor corporations. See Dayton, supra, 739 F.2d at 693, and Lumbard v. Maglia, 621 F.Sup. 1529, 1535 (S.D.N.Y. 1985). This Court agrees and will discuss both issues together.
The factors that courts generally consider in determining whether to characterize an asset sale as a de facto merger are whether (1) there is a continuation of the enterprise of the seller corporation so that there is a continuity of management, personnel, physical location, assets, and general business operations; whether (2) there is a continuity of shareholders which results from the purchasing corporation paying for the acquired assets with shares of its own stock, this stock ultimately to be held by the shareholders of the seller corporation so that they become a constituent part of the purchasing corporation; whether (3) the seller corporation ceases its ordinary business operations, and dissolves as soon as legally and practically possible; and whether (4) the purchasing corporation assumes those obligations of the seller ordinarily necessary for the uninterrupted continuation of normal business operations of the seller corporation.
Cargill v. Beaver Coal & Oil Co., 424 Mass. 356, 359-60 (1997).
“In determining whether a de facto merger has occurred, courts pay particular attention to the continuation of management, officers, directors and shareholders.” Id. at 360. See Dayton, supra, 739 F.2d at 693. “Central to a defacto merger ... is a finding that the shareholders continued into the buyer corporation.” John S. Boyd Co., supra 992 F.2d at 408-09. Such continuity is “one of the key requirements” of a defacto merger. Dayton, supra, 739 F.2d at 693.
In the 1973 transaction, however, there was no continuity of shareholders between North Shore Gas and Boston Gas. Prior to the sale of the North Shore Gas assets, NEES owned 97.83% of the outstanding shares of stock of North Shore Gas, and the small balance was owned by the public. NEES and the public each received cash for their stock in North Shore Gas. Neither received any Boston Gas stock as part of the asset purchase. Consequently, the most significant element in finding a de Jacto merger was not present.
Eastern’s brief ownership of the North Shore Gas stock between the first and second closing on December 20, 1973, does not provide the requisite shareholder continuation. When the asset purchase was consummated, Boston Gas owned North Shore Gas’s assets and NEES had cash. Eastern’s acquisition of the stock of North Shore Gas from NEES to facilitate the asset purchase does not change the character of the transaction.
Nor was there a continuity of management or operations. All of the officers and directors of North Shore Gas resigned after NEES sold its stock. The organization of management also changed after the transaction. Boston Gas’s pre-existing functional management structure remained intact after the transfer.
In assessing the very same transaction, the First Circuit concluded that “Boston Gas . . . did not share in any . . . continuity” of shareholders, officers and directors of North Shore Gas. John S. Boyd Co., supra, 992 F.2d at 409.
Consequently, there was neither a defacto merger nor a continuation of the enterprise resulting from the 1973 transaction.
The Remaining Motions
The two remaining motions are: Plaintiffs Motion to File Motion for Summary Judgment Under Seal (Paper #21); and Plaintiffs Emergency Motion to Strike Defendants’ Summary Judgment Motions (Paper #22). No adequate basis for filing the summary judgment motions under seal has been presented, nor is there a sufficient ground to strike the defendants’ summary judgment motions.
CONCLUSION
For the foregoing reasons the Court enters the following Orders:
1. Plaintiffs Partial Motion for Summary Judgment (Paper #20) is DENIED;
2. Defendant Boston Gas Company’s Motion for ■ Summary Judgment (Paper #23) is ALLOWED;
3. Defendant KeySpan New England, LLC’s Motion for Summary Judgment (Paper #24) is ALLOWED;
4. Defendant National Grid USA’s Motion for Summary Judgment on Corporate Successor Issues (Paper #26) is ALLOWED;
5. Plaintiffs Motion to File Motion for Summary Judgment Under Seal (Paper #21) is DENIED; and
6. Plaintiffs Emergency Motion to Strike Defendants’ Summary Judgment Motions (Paper #22) is DENIED.

The third party is unnamed and is not a party to this action.

No such study is mentioned in the agreed facts. Of course, such a study is not a necessary predicate to establishing liability on a statutorily responsible person.

In actuality, My Bread is not really a veil-piercing situation in the traditional sense. Rather, the SJC there reached from one corporation to find liability in another corporation with common ownership by a route that carried it up to common stockholders and then down again to the other corporation.

CERCLA was enacted in 1980 and G.L.c. 21E was enacted in 1983.

St. 1908, c. 529.